**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IN RE: RECALLED ABBOTT INFANT
FORMULA PRODUCTS LIABILITY
LITIGATION

This Document applies to:

Andaluz v. Abbott Laboratories d/b/a Abbott
Nutrition
1:22-cv-04157[1]

Boysen v. Abbott Laboratories d/b/a Abbott
Nutrition
1:22-cv-01259

Deffebaugh v. Abbott Laboratories d/b/a
Abbott Nutrition
1:22-cv-01079

Garza v. Abbott Laboratories d/b/a Abbott
Nutrition
1:22-cv-01080

Harkless v. Abbott Laboratories Inc.
1:22-cv-01097

Lyons v. Abbott Laboratories d/b/a Abbott
Nutrition
1:22-cv-01125

Menendez v. Abbott Laboratories d/b/a Abbott
Nutrition
1:22-cv-01082

Raymond v. Abbott Laboratories Inc.
1:22-cv-01014

---

[1] The original *Andaluz* action was filed in California and transferred to the MDL. The Parties entered into a stipulation to dismiss the original complaint and refile the *Anadaluz* action in the Northern District of Illinois, Dkt. No. 92. Once the Court enters the proposed order, the action will be refiled and assigned a new civil action number.

| | |
|---|---|
| Reyes v. Abbott Laboratories d/b/a Abbott Nutrition<br>1:23-cv-00534 | MDL No. 3037<br>Master Docket No. 22 C 4148<br>Honorable Matthew F. Kennelly |
| Rouland v. Abbott Laboratories d/b/a Abbott Nutrition<br>1:23-cv-00535 | |
| Steele v. Abbott Laboratories Inc.<br>1:22-cv-04162 | |
| Whitmore v. Abbott Laboratories d/b/a Abbott Nutrition<br>1:22-cv-01012 | |
| William v. Abbott Laboratories d/b/a Abbott Nutrition<br>1:22-cv-04161 | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO ABBOTT'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 2

I.    CONDUCT SINCE 2018 UNDERSCORES THE LEGITIMACY OF PLAINTIFFS' CLAIMS ................................................................................................ 2

     A.   *An Overview of the Long History of Unsanitary Conditions at AN-Sturgis* ............. 3

     B.   *Government Scrutiny Regarding AN-Sturgis* ................................................. 6

II.   ABBOTT'S ARGUMENTS FAIL ................................................................. 8

     A.   *Article III Standing* .............................................................................. 9

     B.   *Notice of Plaintiffs' Claims* ................................................................. 10

     C.   *Plaintiffs' Consumer Protection Act Claims* ......................................... 11

     D.   *Plaintiffs' Unjust Enrichment Claims* ................................................. 12

STANDARD OF REVIEW .................................................................................. 13

ARGUMENT ........................................................................................................ 13

I.    THEORIES OF HARM ................................................................................ 13

     A.   *Plaintiffs and the Class Possess Article III Standing* ........................... 13

        1.   *Plaintiffs' Amended Complaint establishes Article III standing given it sets forth a plausible claim that Plaintiffs suffered a "traditional tangible harm" in the form of economic loss* ................................................................. 13

        2.   *The case law Abbott relies upon is not compelling and worse ignores binding Seventh Circuit precedent* ................................................................. 18

        3.   *Actual Injury Exists* ................................................................. 20

     B.   *Abbott's Contention that Plaintiffs are Predicating Liability Exclusively on the Fact a Recall Occurred, or that Plaintiffs are Seeking Damages Beyond the Diminution in Value to the Cost of the Formula is Wrong* ................................................. 23

     C.   *The Refund Program Does Not Affect Article III Standing* ................ 24

II.   PLAINTIFFS' CLAIMS ARE VIABLE ................................................................26

    **A.**    ***Plaintiffs Properly Pled Breach of the Implied Warranty of Merchantability*** ........26

          *1.*    Abbott possessed sufficient notice of Plaintiffs' breach of implied warranty claims ................................................................................................................26

          *2.*    Determining privity is inappropriate at the motion to dismiss stage; regardless, recognized exceptions to privity exist here ........................................30

          *3.*    The Class Products were not merchantable .......................................33

          *4.*    The Missouri warranty claim does not fail .......................................35

    **B.**    ***Plaintiffs Adequately Plead Consumer Protection Claims*** .......................................36

          *1.*    Plaintiffs adequately plead CPA claims ...........................................37

          *2.*    Abbott's case law supporting its heightened Rule 9 standard is unavailing ......40

          *3.*    Abbott's "Puffery" defense lacks merit, given the facts underlying the "puffery" emanate from FDA's Form 483 and DOJ's subsequent criminal investigation of Abbott's conduct at AN-Sturgis .........................................41

    **C.**    ***Abbott's Miscellaneous Notice Defense Related to California's CLRA Claim Lacks Merit*** ................................................................................................................42

          *1.*    Plaintiffs complied with the CLRA's "notice requirement" ..............42

          *2.*    The Consolidated Complaint is an administrative summary of the claims and by stipulation of the Parties, Plaintiff Andaluz's CLRA affidavit must and will be attached to his forthcoming complaint to be filed in this Court ........................44

    **D.**    ***Plaintiffs' Properly Pled their Claims for Unjust Enrichment*** .................................45

          *1.*    Rule 8 Permits Alternative Pleading ..................................................45

          *2.*    California and Illinois recognize unjust enrichment as a cause of action .........48

          *3.*    Plaintiffs' unjust enrichment claims are properly pled and should not be dismissed at this early stage of litigation; Plaintiffs conferred a direct benefit on Abbott through the purchase of its products .......................................49

CONCLUSION ...............................................................................................................51

## TABLE OF AUTHORITIES

*Adam v Barone*, 41 F.4th 230 (3d Cir. 2020)...............................................................25

*Aliano v. Louisville Distilling Co., LLC*, 115 F. Supp. 3d 921 (N.D. Ill. 2015)...........................22

*Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102 (3d Cir. 1992)..................................34

*Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164 (W.D.N.Y. 2014)..................................................37

*Apex Mgmt. Corp. v. WSR Corp.*, 225 B.R. 640 (N.D. Ill. 1998)..................................................30

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................................................13

*Association Benefit Services, Inc. v. Caremark RX, Inc.*, 493 F.3d 841 (7th Cir. 2007)..............49

*Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753 (9th Cir. 2015)............................................48

*Barnes et al. v. Unilever U.S. Inc.,* 1:21-cv-06191, 2022 WL 2915629 (N.D. Ill. July 24, 2022) ("*Barnes I*")................................................................................................................. *passim*

*Barnes v. Unilever U.S., Inc.*, 1:21-cv-06191, 2023 WL 2456385 (N.D. Ill. March 11, 2023) ("*Barnes II*") ......................................................................................................... 2, 16-21

*Bd. of Educ. of City of Chi. v. A, C & S, Inc.*, 546 N.E.2d 580 (Ill. 1989) ....................................30

*Bell v Publix Super Markets*, 982 F.3d 868 (7th Cir. 2020) ........................................................37

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................13

*Berry v. FCA U.S., LLC*, No. 2:19-CV-00023, 2022 WL 18671067 (S.D. Tex. Mar. 25, 2022) ..46

*Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599 (7th Cir. 2009)..................................................13

*Bland v Abbott Lab., Inc.*, No. 3:11–CV–430–H, 2012 WL 524473 (W.D. Ky. Feb. 16, 2012) ..41

*Boykin v. KeyCorp*, 521 F.3d 202 (2d Cir. 2008) ........................................................................37

*Brandt v. Boston Scientific Corp.*, 792 N.E.2d 296 (Ill. 2003)....................................................33

*Bria Health Services v Eagleson*, 950 F.3d 378 (7th Cir 2020) ..................................................18

*Brown v Abbott Lab. Inc.*, No. 10 C 6674, 2011 WL 4496154 (N.D. Ill. Sept. 27, 2011) ...........41

*Bruton v. Gerber Products Co.*, 703 F. App'x 468 (9th Cir. 2017)...............................................48

*Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555 (S.D.N.Y. 2016) ........................................48

*Burr v. Sherwin Williams Co.*, 268 P.2d 1041 (Cal. 1954)..........................................................30

*Cabrales v. Castle & Cooke Mortgage, LLC*, No. 1:14–cv–01138–MCE–JLT, 2015 WL 3731552 (E.D. Cal. June 12, 2015)............................................................................................................46

*Campbell-Ewald Co v Gomez*, 577 US 153 (2016) ..................................................................25

*Carder v. Graco Children's Products, Inc.*, 558 F. Supp. 3d 1290 (N.D. Ga. 2021)........17, 19, 28

*Carter v. Morgan Stanley*, No. RDB-16-3102, 2017 WL 1382318 (D. Md. Apr. 18, 2017) ........41

*Castillo v. Unilever*, No. 20 C 6786, 2022 WL 704809 (N.D. Ill. Mar. 9, 2022).........................20

*Charlton v. LG Energy Sol. Mich. Inc.*, No.: 3:21-cv-02142-RBM-JLB, 2023 WL 1420726 (S.D. Cal. Jan. 31, 2023) ..................................................................................................................24

*Choi v. Kimberly-Clark Worldwide, Inc.*, No. SA CV 19-0468-DOC, 2019 WL 4894120 (C.D. Cal. Aug. 28, 2019)..................................................................................................................34

*Clemens v. DaimlerChrysler Corp.*, 535 F.3d 1017 (9th Cir. 2008) ............................................31

*Click v. Gen. Motors LLC*, No. 2:18-CV-455, 2020 WL 3118577 (S.D. Tex. Mar. 27, 2020)39-41

*Common Cause Indiana v. Lawson*, 978 F.3d 1036 (7th Cir. 2020) ............................................21

*Corra v. Energizer Holdings, Inc.*, 962 F. Supp. 2d 1207 (E.D. Cal. 2013) ................................44

*Coy's Honey Farm Inc v. Bayer Corp.*, MDL No. 1:18md2820 SNLJ, 2022 WL 179210 (W.D. Mo. Jan. 20, 2022) ......................................................................................................................41

*Cuevas v. United Brands Co., Inc.*, 11CV991 BTM RBB, 2012 WL 760403 (S.D. Cal. Mar. 8, 2012) ........................................................................................................................................44

*Datil v. C.R. Bard, Inc.*, No. 19 C 8274, 2020 WL 5810402 (N.D. Ill. Sept. 30, 2020) ...............29

*Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076 (11th Cir. 2019) ......................................17

*Deutsch v. Cook*, No. 1:19-cv-00281-DAD-SAB, 2020 WL 977894 (E.D. Cal. Feb. 28, 2020)..48

*Eason v. Roman Cath. Bishop of San Diego*, 414 F. Supp. 3d 1276 (S.D. Cal. 2019).................47

*FAA v. Cooper*, 566 U.S. 284 (2012).........................................................................................22

*Fearrington v. Boston Science*, 410 F. Supp. 794 (S.D. Tex. 2019) ............................................40

*Fed. Ins. Co. v. Lazzara Yachts of N. Am., Inc.*, No. 8:09-CV-607-T-27MAP, 2010 WL 1223126 (M.D. Fla. Mar. 25, 2010)........................................................................................................29

*Feiner v. Innovation Ventures LLC*, No. 12–62495–CIV, 2013 WL 2386656 (S.D. Fla. May 30, 2013) ........................................................................................................................................49

*Felice v. Invicta Watch Co. of America, Inc.*, No. 16-CV-62772-RLR, 2017 WL 3336715 (S.D. Fla. Aug. 4, 2017) ........................................................................................................................29

*Flores v. FCA*, No. 19-10417, 2020 WL 7024850 (E.D. Mich. Nov. 30, 2020) ..........................24

*Fortech, L.L.C. v. R.W. Dunteman Co.*, 852 N.E.2d 451 (Ill. App. Ct. 2006)...............................49

*Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659 (E.D. Mich. 2020) .......................................29

*Frank's Maintenance & Eng'g, Inc. v. C.A. Roberts Co.*, 408 N.E.2d 403 (Ill. App. Ct. 1st Dist. 1980) ...............................................................................................................................................30

*Freeman v. Indochino Apparel, Inc.*, 443 F. Supp. 3d 1107 (N.D. Cal. 2020)..............................47

*Gamez v. Summit Naturals, Inc.*, No. CV 22-05894 DSF (KSx), 2022 WL 17886027 (C.D. Cal. Oct. 24, 2022) ................................................................................................................................48

*Genesis Healthcare Corp. v. Symczyk*, 569 US 66 (2013)............................................................25

*Geske v. PNY Technologies, Inc.*, 503 F. Supp. 3d 687 (N.D. Ill. 2020).....................................22

*Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233 (D. Kan. 2007) .................................................31

*Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681 (Ill. App. Ct. 1st Dist. 2005)................................46

*Hampson v. Am. Mktg. Rsch. Inc.*, No. 1:10-CV-0430-JEC-RGV, 2011 WL 13318764 (N.D. Ga. Jan. 21, 2011) .................................................................................................................................41

*Hartford Casualty Ins. Co. v. J.R. Marketing, L.L.C.*, 353 P.3d 319 (Cal. 2015) ........................48

*Haas v. Travelex Ins. Servs. Inc.*, 555 F. Supp. 3d 970 (C.D. Cal. 2021) ....................................46

*Harris v. Nordyne, LLC*, No. 14-CIV-21884-BLOOM/Valle, 2014 WL 12516076, at *7 (S.D. Fla. Nov. 14, 2014) ...............................................................................................................................47

*Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39 (Tex. 1992) .....................................49

*Henderson v. Gruma Corp.*, No. CV 10-04173 AHM (AJWx), 2011 WL 1362188 (C.D. Cal. Apr. 11, 2011) .......................................................................................................................................44

*Hill v. Hoover Co.*, 899 F. Supp. 2d 1259 (N.D. Fla. 2012).........................................................47

*Hill v. LLR, Inc.*, No. 18-120, 2019 WL 2404900 (D. Mont. Mar. 8, 2019) ................................25

*Holman v. Ali Industries, LLC*, No. 4:22-cv-4133-NKL, 2023 WL 1438752 (W.D. Mo. Feb. 1, 2023) ....................................................................................................................................... 22, 35-36

*HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672 (Ill. 1989) ..... 48-49

*In re: 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 275 F. Supp. 3d 910 (N.D. Ill. 2017)) ................................................................................................................................37

*In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 348 F. Supp. 3d 797 (N.D. Ill. 2018) ................................................................................................................................37

*In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011) .................................2, 16, 18, 20

*In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*, 155 F. Supp. 2d 1069 (S.D. Ind. 2001) ............................................................................................................................................28, 34

*In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374 (E.D. Va. 2020) ......22

*In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919 (C.D. Cal. 2015) ....................................................49

*In re Evenflo Co. Inc., Mktg., Sales Practices & Prod. Liab. Litig.*, 54 F.4th 28 (1st Cir. 2022) ..... ................................................................................................................................ 14, 16, 18-19

*In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. 03-4558 (GEB), 2010 WL 2813788 (D.N.J. July 9, 2010) ................................................................................................28

*In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262 (S.D.N.Y. 2018) ..................21

*In re Gen. Motors LLC Ignition Switch Litig.*, 14-MD-2543, 2016 WL 3920353 (S.D.N.Y. July 15, 2016) ...............................................................................................................................35

*In re Gerber Products Co. Heavy Metal Baby Food Litig.*, No. 1:21-cv-269 (MSN/JFA), 2022 WL 10197651 (E.D. Va. Oct. 17, 2022) ......................................................................................19

*In re L & S Indus., Inc.*, 989 F.2d 929 (7th Cir. 1993) ..............................................................30

*In re Mattel, Inc.*, 588 F. Supp. 2d 1111 (C.D. Cal. 2008)25 44*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447 (D. Md. 2020) ......................................................22

*In re McConnell*, 390 BR 170 (Bank. W.D. Pa. 2008) .................................................................41

*In re Morning Song Bird Food Litig.*, No. 12-cv-1592 JAH (RBB), 2013 WL 12144051 (S.D. Cal. Sept. 30, 2013). ...................................................................................................................22

*In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936 (N.D. Cal. 2014) ........................ 28-29

*In re Rust-Oleum Restore Mktg., Sales Prac. & Prod. Liab. Litig.*, 155 F. Supp. 3d 772 (N.D. Ill. 2016) ...............................................................................................................27-29, 31-32

*In re Seagate Tech LLC Litig.*, 233 F. Supp. 3d 776 (N.D. Cal. 2017) .........................................41

*In re Takata Airbag Prod. Liab. Litig.*, No. 15-2599-MD-MORENO, 2017 WL 2406711 (S.D. Fla. June 1, 2017) ..........................................................................................................................50

*In re Takata Airbag Products Liab. Litig.*, No. 15-2599-MD-MORENO, 2017 WL 775811 (S.D. Fla. Feb. 27, 2017) ............................................................................................................51

*In re Testosterone Replacement Therapy Prod. Liab. Litig.*, No. 14 C 1748, 2014 WL 7365872 (N.D. Ill. Dec. 23, 2014) ....................................................................................................30, 33

*In re Toyota Motor Corp. Unintended Acceleration Mktg. Sales Prac., and Prod. Liab. Litig.*, 754 F. Supp. 2d 1145 (C.D. Cal. 2010) ..............................................................................35

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067 (N.D. Cal. 2021) ..................48

*In re Valsartan, Losartan, and Irbesartan Prod. Liab. Litig.*, MDL No. 2875 (RBK-JS), 2021 WL 222776 (D.N.J. Jan. 22, 2021) ........................................................................................34

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719 (5th Cir. 2018) ......................................................................................................................39

*Jasper v. Abbott*, 834 F. Supp. 2d 766 (N.D. Ill. 2011) ..............................................................20

*Kansas City Hispanic Ass'n Contractors Enter., Inc. v. City of Kansas City*, 279 S.W.3d 551 (Mo. App. Ct. W.D. 2009) ..........................................................................................................31

*Kavon v. BMW of North America, LLC*, 605 F. Supp. 3d 622 (D.N.J. 2022) ..............................34

*Kim v. Carter's Inc.*, 598 F.3d 362 (7th Cir. 2010). ..................................................................22

*Kraft v Essentia Health*, 604 F.Supp.3d 813 (D.N.D. 2022) ....................................................41

*Lachmund v ADM Investment Services, Inc.*, 191 F.3d 777 (7th Cir. 1999) ..............................40

*Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622 (7th Cir. 2017) ......................................25

*Linde v. Envision Healthcare Corp.*, No. 2:20-cv-02661-HLT-TJJ, 2021 WL 3089214 (D. Kan. July 22, 2021) ......................................................................................................................47

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................................14

*Martelack v. Toys R Us*, No. 13-7098, 2016 WL 762656 (D.N.J. Feb. 25, 2016) ......................25

*Martin v. Ford Motor Co.*, 765 F. Supp. 2d 673 (E.D. Pa. 2011) ..............................................25

*McDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087 (N.D. Cal. 2014) ......................................38

*Merino v. Ethicon Inc.*, 536 F. Supp. 3d 1271 (S.D. Fla. 2021) ..............................................30

*Micci v. Thomas*, 738 A.2d 219 (Conn. App. Ct. 1999) ............................................................30

*Miller v. Basic Research, Inc.*, No. 2:07–CV–871 TS, 2008 WL 4755787 (D. Utah Oct. 27, 2008) ....................................................................................................................................46

*Moore Construction Co., Inc. v. Clarksville Department of Electricity*, 707 S.W.2d 1 (Tenn. App. Ct. 1985) .................................................................................................................................31

*Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235 (Cal. App. Ct. 2d Dist. 2009) ....... ...........................................................................................................................................42, 44

*Nalley v. Gen. Motors LLC*, No. 1:21-cv-04174-WMR, 2022 WL 18459646 (N.D. Ga. Aug. 30, 2022) ..............................................................................................................................47

*Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 34 N.E.3d 1023 (Ill. App. Ct. 1st Dist. 2015) ...............................................................................................................................................49

*NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293 (7th Cir. 2019) ...................................13

*Oyoque v. DePaul Univ.*, 520 F. Supp. 3d 1058 (N.D. Ill. 2021) .................................................46

*PDF Print Commc'ns Inc. v. Federated Mut. Ins. Co.*, No. CV219896MWFAGRX, 2022 WL 2189631 (C.D. Cal. Mar. 29, 2022) ..............................................................................48

*Pirelli v Armstrong Tire Corp Retiree Medical Benefits Trust v Walgreen*, 631 F.3d 436 (7th Cir. 2011) .............................................................................................................................37, 41

*Rezac Livestock Comm'n Co. v. Pinnacle Bank*, 255 F. Supp. 3d 1150 (D. Kan. 2017)..............46

*Romano v. Motorola, Inc.*, No. 07-CIV-60517, 2007 WL 4199781 (S.D. Fla. Nov. 26, 2007)....50

*Rosales v. FitFlop*, 882 F. Supp. 2d 1168 (S.D. Cal. 2012) ........................................................44

*Rothe v. Maloney Cadillac, Inc.*, 518 N.E.2d 1028 (Ill. 1988) ....................................................30

*Rudy v Family Dollar Stores*, 583 F. Supp. 3d 1149 (N.D. Ill. 2022) ..........................................25

*Sandee's Catering v. Agri Stats, Inc.*, No. 20 C 2295, 2021 WL 963812 (N.D. Ill. Mar. 15, 2021) ...............................................................................................................................................48

*Sagaswara v Ford*, No. 18-CV-06159-LHK, 2019 WL 3945105 (N.D. Cal. Aug. 21, 2019). .....24

*Sharma v. Volkswagen AG*, 524 F. Supp. 3d 891 (N.D. Cal. 2021) .............................................48

*Sharp v FCA*, No. 21-12497, 2022 WL 14721245 (E.D. Mich. Oct. 25, 2022) ..........................24

*Silving v Wells Fargo Bank*, 800 F. Supp. 2d 1055 (D. Ariz. 2011) ............................................41

*Spokeo v Robins*, 578 US 330 (2016) .................................................................................. 15-16

*Starrett v. Commercial Bank of Ga.*, 486 S.E.2d 923 (Ga. App. Ct. 1997)..................................30

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ...........................................................13, 16

*Terrill v. Electrolux Home Products, Inc.*, 753 F. Supp. 2d 1272 (S.D. Ga. 2010)......................50

*True v. Am. Honda Motor Co.*, 520 F. Supp. 2d 1175 (C.D. Cal. 2007) ........................................39

*Tylka v Gerber Foods*, No. 96 C 1647, 1999 WL 495126 (N.D. Ill. July 1, 1999)......................41

*U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009) .................................................38

*Util. Consumers' Action Network v. Sprint Solutions, Inc.*, No. C07-CV-2231-W RJB, 2008 WL 1946859 (S.D. Cal. Apr. 25, 2008)..............................................................................................44

*Verde v. Stoneridge, Inc.*, 137 F. Supp. 3d 963 (E.D. Tex. 2015) .................................................25

*Vuotto v Abbott Lab., Inc.*, No. 10 C 7255, 2011 WL 3876923 (N.D. Ill. Aug. 31, 2011) ..........20

*Waller v. Hewlett-Packard Co.*, No. 11cv0454–LAB (RBB), 2011 WL 6325972 (S.D. Cal. Dec. 16, 2011) .....................................................................................................................................44

*Wildin v. FCA US LLC*, No. 3:17cv-02594-GPC-MDD, 2018 WL 3032986 (S.D. Cal. June 19, 2018) ..........................................................................................................................................47

*Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4901346 (S.D. Fla. Oct. 14, 2011) ..........................................................................................................................................50

*Womick v Kroger Co.*, No. 21-CV-00574-NJR, 2022 WL 673095 (S.D. Ill. Mar. 7, 2022)............ ................................................................................................................................. 37-38, 40

*Xia Bi v McAuliffe*, 927 F.3d 177 (4th Cir. 2019)........................................................................40

*Yachera v. Westminster Pharmaceuticals, LLC*, 477 F. Supp. 3d 1251 (M.D. Fla. 2020)............34

*Young v. Kenneth Jackson Elec., Inc.*, No.2005-CA-001242-MR, 2006 WL 2787077 (Ky. App. Ct. Sept. 29, 2006) ....................................................................................................................31

*Zeigler v. Sony Corp. of America*, 849 A.2d 19 (Conn. Super. Ct. 2004) ....................................50

## INTRODUCTION

Abbott[2] filed its Motion to Dismiss the Amended Consolidated Class Action Complaint ("AC") urging the Court to dismiss the economic loss claims alleging, in part, Class plaintiffs lack standing to bring claims because they were not physically injured by the contaminated formula. Despite years of unsanitary conditions at the Sturgis plant, Abbott also contends various consumer protection claims—brought on behalf of parents who purchased Abbott's products—lack merit. Abbott is wrong.

The class members purchased Abbott powdered infant formula to feed and nourish their infant children. Following the discovery of the dirty and unsafe conditions at the Sturgis, Michigan plant—that ultimately led to the United States Food and Drug Administration ("FDA") requiring closure of the plant and a Consent Decree with the Department of Justice—these parents brought actions seeking to recover for economic losses as a result of their purchase of contaminated formula. Abbott's characterization of Plaintiffs as "admittedly uninjured" is inconsistent with the law and the facts.

The parents in these actions bought Abbott's powdered infant formula based upon false and misleading claims that the products were unadulterated and safe to feed their children. These purchases were made with the expectation that the formula purchased would not harm their babies. Only later did these parents learn of the risk of contamination due to the unsanitary conditions in which Abbott manufactured the formula. As a result, the Class did not receive the benefit of the bargain given no one intentionally purchases contaminated products to feed their children. *See, e.g.*, AC ¶ 8. The simple fact is this: the law does not require that the Complaint establish the products were contaminated *or* that the child became ill after consuming the formula. Specifically,

---

[2] Abbott Laboratories, along with Abbott Nutrition (collectively, "Abbott" or "Defendant").

in *Barnes et al. v. Unilever U.S. Inc.*, 1:21-cv-06191, 2022 WL 2915629, at *1-2 (N.D. Ill. July 24, 2022) ("*Barnes I*"), this Court denied a nearly identical motion to dismiss concluding:

> Barnes alleges that she was deprived of the benefit of her bargain, in that she would not have purchased the products, or would not have purchased them for the listed price, had she known they contained a human carcinogen. Under *In re Aqua Dots Products Liability Litigation*, 654 F.3d 748, 751 (7th Cir. 2011), this is a sufficient allegation of an injury in fact.

*Barnes I*, 2022 WL 2915629, at *1. Eight months later, the Court revisited the standing question in response to defendant's renewed motion to dismiss. In that motion, defendant argued—as Abbott does here—that Barnes lacked standing because she could not establish *all* of the products included benzene. Once again, this Court easily dispatched with the argument holding, "it is irrelevant if only some of the products were contaminated." *Barnes v. Unilever U.S., Inc.*, 1:21-cv-06191, 2023 WL 2456385, at *5 (N.D. Ill. March 11, 2023) ("*Barnes II*"). Of course, of the fifteen pages of citations compromising some 200 individual cases that Abbott relies upon, not one is devoted to either *Barnes I* or *Barnes II*. Accordingly, a plaintiff's contention she would not purchase a product due to a risk of contamination readily establishes standing. *Barnes II*, at *5.

Because Plaintiffs pled viable theories of harm, their claims for implied warranty, various state consumer protection statutes, and unjust enrichment must survive. The Consolidated Complaint covers the claims of 26 Plaintiffs, which includes a national class and 20 state law classes. These claims are adequately pled. Accordingly, this Court ought to deny Defendant's Motion to Dismiss.

## BACKGROUND

### I. ABBOTT'S CONDUCT SINCE 2018 UNDERSCORES THE LEGITIMACY OF PLAINTIFFS' CLAIMS.

Throughout its 53-page brief, Abbott spends exactly eight sentences across two paragraphs describing the facts surrounding the "precautionary recall" of its infant formula products. And

2

while brevity is often mused as the soul of wit, sometimes you need to delve deeper into the facts. To that end, Plaintiffs provide the following background underpinning Plaintiffs' claims.

A.      **An Overview of the Long History of Unsanitary Conditions at AN-Sturgis.**

Abbott's facility in Sturgis, Michigan ("AN-Sturgis") has a long history of consumer complaints and problematic FDA inspections dating back to at least 2018. AC ¶ 64. These complaints and investigations reflect the dangerous and continuous errors in both the production and sanitation process at AN-Sturgis.

In 2018, following an inspection, FDA issued an Establishment Inspection Report ("EIR") noting Defendant's non-conformity with safety protocols and positive *Cronobacter* test results. AC ¶ 64. On September 24, 2019, FDA issued a Form 483 detailing that its inspection established Defendant failed to test aggregate samples of infant formula at the final product stage and before distribution to ensure its products met the required microbiological quality standards. *Id.* ¶ 65; attached hereto as Exhibit A..

In 2022, a confidential former employee report was released detailing the history of unsafe practices and poor sanitation at AN-Sturgis throughout 2018 to 2021. Specifically, on October 21, 2021, FDA received an electronic complaint about AN-Sturgis from a confidential informant. Ex. A to AC (the "Whistleblower Complaint"). The Whistleblower is a former long-time employee at AN-Sturgis and as such, possessed detailed knowledge of the day-to-day activity at the plant. Based on this knowledge, the Whistleblower was aware of the lack of controls at AN-Sturgis, and personally observed the lack of clean and safe conditions within the facility. The Whistleblower Complaint describes a pattern and practice of the "falsification of records on a regular and ongoing basis." *Id.* at 5-18. This included details of shipping Similac Sensitive where Abbott knew seam integrity issues with packaging existed—that can lead to air, moisture and bacteria intruding into

the can—but did nothing to recall any product released into distribution. *Id*. at 7. Months later, as opposed to recalling the product—as it was required to do—Abbott destroyed the non-distributed product within its control and refused to alert consumers or regulators of the risk for potential contamination. *Id*. at 8.

More concerning, the Whistleblower Complaint identified faulty equipment that allowed bacteria to enter the system and led to bacteria not being adequately cleaned out during the equipment cleaning process. *Id*. at 18. As a result, the Whistleblower Complaint includes multiple examples of Abbott's distribution of untested infant formula *after* findings of microbial contamination (*id.* at I(B)(1)) specifically noting, "[p]rior to the 2019 FDA audit, management authorized the release of infant formula that tested positive for micros" with no further testing to ensure it was safe for consumption. *Id.* In addition, the report identified repeated efforts—by Abbott—to avoid regulators learning of the unsafe conditions (*id.* at I(B)(3) and 18-20) concluding, the "violations are neither inadvertent nor minor in nature." AC ¶¶ 94-95.

Nearly contemporaneous with the Whistleblower Complaint, on September 20, 2021, FDA learned of a *Cronobacter*[3] infection in an infant who reportedly consumed powdered formula produced at AN-Sturgis. AC at ¶¶ 69-71. FDA conducted an inspection at AN-Sturgis from September 20-24, 2021, and following its inspection, issued a Form 483 reporting the following:

1.     You did not maintain a building used in the manufacture, processing, packing or holding of infant formula in *a clean and sanitary* condition;

2.     You did not install a REDACTED capable of REDACTED when REDACTED is

---

[3] *Cronobacter* and *Salmonella* infections are the infections associated with the powdered infant formula in this MDL. Both are bacterial in nature. *Cronobacter* can be introduced into formula powder if contaminated ingredients are used to make the formula or the formula powder touches a contaminated surface. An infant infected with *Cronobacter* could develop sepsis (severe bloodstream infection) or meningitis (an infection of the protective membranes surrounding the brain). Both *Cronobacter* and *Salmonella* can be deadly for infants.

used at a product filling machine;

3.    Personnel working directly with infant formula, its raw materials, packaging, or equipment or utensil contact surfaces *did not wash hands* thoroughly in a hand washing facility at a suitable temperature after the hands may have become soiled or contaminated;

4.    An instrument you used to measure, regulate, or control a processing parameter was not properly maintained; and

5.    You did not monitor the temperature in thermal processing equipment at a frequency as is necessary to maintain temperature control.

AC. ¶ 67 (emphasis supplied). FDA also issued an EIR in September 2021 based on prior inspections of AN-Sturgis. AC ¶ 68. The EIR identified 15 complaints of *Salmonella* infections and one *Cronobacter* infection. *Id*. Worse, the EIR reported finding *Cronobacter* in two batches of Abbott's powdered infant formula and in multiple environmental samples dating back to 2019. *Id*. Between September 2021 and December 2021, FDA received two additional reports of *Cronobacter* infections. AC ¶ 72.

Following these reports, FDA scheduled a for-cause inspection of the plant. During the FDA's 2022 inspection of AN-Sturgis which occurred over several months, seven environmental swabs collected on February 7 suggested the presence of *Cronobacter*. *See* March 18, 2023 Form 483 (hereinafter "Form 483") at 1.[4] On February 13, FDA confirmed that six of the seven samples contained *Cronobacter*. *Id*. FDA then issued three separate recall recommendations to Abbott on February 15-17. AC ¶ 75. Finally, after the third recommendation, and while the agency inspection remained ongoing, FDA issued a consumer advisory, warning consumers to avoid certain Abbott

---

[4] FDA conducted multiple inspections of AN-Sturgis between January 31, 2022, and March 18, 2022. The findings of these inspections are set forth in a March 18, 2022, Form 483 Inspectional Observations Report. AC fn. 53. https://www.fda.gov/media/157708/download (last visited March 23, 2023). The Court can take judicial notice of Form 483 as a publicly available document included within the Amended Complaint. *See Palay v. United States*, 349 F.3d 418, 425 n.5 (7th Cir. 2003) (when considering a Rule 12(b)(6) motion to dismiss, a court may take judicial notice of matters of public record).

products effectively forcing Abbott to begin a "voluntary recall" of its products along with ceasing production of powdered infant formula at AN-Sturgis. *Id.* ¶¶ 75-76.

Ultimately, FDA documented the findings of its months-long inspection of AN-Sturgis in Form 483 dated March 18, 2022. AC ¶ 92. The following reflects a non-exhaustive list of FDA's findings:

1. You did not establish a system of process controls covering all stages of processing that was designed to ensure that infant formula does not become adulterated due to the presence of microorganisms in the formula or in the processing environment (Form 483 at 1);

2. Between September 25, 2019, and February 20, 2022, your firm's environmental samples and finished product testing confirmed the presence of *Cronobacter* spp. (*id.* at 2);

3. You did not ensure that all surfaces that contacted infant formula were maintained to protect infant formula from being contaminated by any source (*id.* at 4);

4. [B]oth FDA and your firm found evidence of *Cronobacter* spp. in your powdered infant formula production environment. Your firm also identified *Cronobacter* spp. in finished powdered infant formula products (*id.* at 5); and

5. Personnel working directly with infant formula, its raw materials, packaging, or equipment or utensil contact surfaces did not wear necessary protective apparel (*id.* at 7).

In short, FDA concluded AN-Sturgis had significant operational deficiencies, produced infant formula in unsanitary conditions, and that its products were likely contaminated with *Cronobacter*.

### B. Government Scrutiny Regarding AN-Sturgis.

Investigations over the conditions at AN-Sturgis did not stop with the recall in February 2022. On May 16, 2022, the U.S. Department of Justice ("DOJ") announced it filed a Complaint and proposed consent decree applicable to AN-Sturgis. AC ¶ 98. In the Complaint, filed by the DOJ on behalf of FDA, the government alleged that formula manufactured at AN-Sturgis were adulterated because they were made under unsanitary conditions and in violation of current good manufacturing practice requirements. Specifically, the Complaint alleged:

6

> Ongoing inadequacies in manufacturing conditions and practices at Defendants'
> facilities demonstrate that Defendants have been unwilling or unable to implement
> sustainable corrective actions to ensure the safety and quality of food manufactured
> for infants, a consumer group particularly vulnerable to foodborne pathogens.
> Defendants' violations of the Act and the likelihood that violations will recur in the
> absence of court action demonstrate that injunctive relief is necessary.

*Id.* ¶ 98. Given FDA's concerns during their recent inspections, the government felt it had no

choice but to require a complaint and consent decree to allow Abbott to continue producing infant

formula at AN-Sturgis.

In addition, members of Congress were so concerned about the situation, that elected

officials called for hearings to discover more about the conditions at AN-Sturgis. During a hearing

before the United States House of Representatives in May 2022, former FDA Commissioner

Robert Califf, M.D., described the conditions at AN-Sturgis stating:

> Let's say you had a next-door neighbor who had leaks in the roof, they didn't wash
> their hands, they have bacteria growing all over the kitchen. You walked in, and
> there was standing water on the counters and the floor, and the kids were walking
> through with mud on their shoes and no one cleaning it up. You probably wouldn't
> want your infant eating in that kitchen. And that's in essence what the inspection
> showed.

*Id.* ¶ 100. Dr. Califf further outlined "shocking" and "egregiously unsanitary" structural and

equipment issues observed at AN-Sturgis. *Id.* ¶ 101.

The investigations continue into recent months. As recently as January 20, 2023, *The Wall*

*Street Journal* confirmed DOJ's Consumer Protection branch opened a *criminal* investigation of

Abbott's AN-Sturgis "voluntary recall" and plant closure. *Id.* ¶ 104. The DOJ's criminal probe

joins the FDA's ongoing probe. *Id.* In February, 2023, Abbott released its Annual Report in its 10-

K filing for the Securities and Exchange Commission.[5] In the Annual report, Abbott disclosed to

---

[5] https://www.abbottinvestor.com/sec-filings/sec-filing/10-k/0001628280-23-004026 (last visited
March 24, 2023). As above, the Court can take judicial notice of a publicly available document.

its investors that not only is the DOJ conducting a criminal investigation, but it has also received

a subpoena from the SEC and a civil investigative demand from the FTC. Finally, on January 21,

2023, Congresswoman Rose DeLauro released the following statement:

> The numerous illnesses, reported deaths, and the shortage could have been prevented if Abbott did not drag its feet to investigate credible allegations of substandard food safety practices at the Sturgis plant. And yet, Abbott quickly went into litigation mode by diverting blame, and not taking accountability. This is a company that has had over 40 lawsuit dockets that include food safety allegations related to Abbott food products filed against Abbott Laboratories before the recall in February 2022. In my view, they have a documented history of shamefully putting production and profits over safety and people.

*Id.* ¶ 105. Representative DeLauro also stated: "Since Abbott's February 2022 recall of

contaminated infant formula, we have seen credible reports that the plant in Sturgis, MI, cut

corners, falsified records, and instituted shoddy safety practices that generated an infant formula

shortage." *Id.* These lawsuits seek to remedy Abbott's systemic safety failure and

misrepresentations to Regulatory Authorities, Congress, and consumers.

## II.    ABBOTT'S ARGUMENTS FAIL.[6]

Simplified to its core, Abbott's argument is as follows: there is no viable path to recovery

for any Plaintiff under any circumstances. And while legal platitudes like "gravamen" and

"precautionary recall" frame a compelling story, *facts* rule the day. The facts are this: the FDA,

the DOJ, a former employee whistleblower, and the Plaintiffs here present the reality (and

consequences) of Abbott's conduct regarding its manufacture of powdered infant formula at AN-

---

*See Palay v. United States*, 349 F.3d 418, 425 n.5 (7th Cir. 2003) (when considering a Rule 12(b)(6) motion to dismiss, a court may take judicial notice of matters of public record).

[6] Defendant moved to dismiss Plaintiffs' negligent misrepresentation claims based on the economic loss doctrine. Given this case is purely economic in nature, and upon consideration of the relevant case law, Plaintiffs agree and are not opposing the motion.

Sturgis. Because the AC sufficiently pleads viable causes of action, Abbott's attempt to sidestep *any* liability to Plaintiffs fails.

### A. Article III Standing.

This case involves consumers who purchased the "Class Products"—powdered infant formula manufactured by Abbott in Sturgis, Michigan susceptible to *Cronobacter* and *Salmonella* contamination. Let there be no mistake: economic loss (i.e., "monetary harm") establishes Article III standing as a traditional tangible harm. Acknowledging as much, it is here that Abbott's argument entirely ignores the allegations in the AC.

Abbott bemoans Plaintiffs' allegations by emphasizing that only "a possibility" or "a risk" that its products "may have" or "might have" or "potentially" or "could" or "could have been" contaminated somehow negates Plaintiffs' standing. Dkt. No. 94-1, at 29-31 (emphasis removed). In Abbott's read of Article III standing, only Plaintiffs who purchased contaminated products have standing. This is simply wrong. Plaintiffs are *not* required to prove—or even allege—that the products they purchased were actually contaminated. Instead, seeking recovery of monetary loss where all products were potentially contaminated is enough to establish Article III standing.

In an attempt to obfuscate standing, Abbott pivots to *its own* entirely fictitious interpretation of one sentence in Plaintiffs' 162-page Amended Complaint: the "radical" "Recall Theory." Plaintiffs do *not* plead a "recall theory," much less a "radical" one. Nor did the Amended Complaint ever use that phrase or contemplate damages beyond the diminished value of Abbott's powdered infant formula. Instead, Plaintiffs simply pled they would not have paid the purchase price for Abbott's products had they known of the substantial risk of contamination. Relevant case law is clear that is enough for Article III standing.

In a last-ditch effort to avoid liability stemming from the "precautionary recall," Abbott argues the existence of a refund program removes standing for the *entire* class. This is simply wrong. Even assuming the entire class is subject to the refund program (which it is not), the mere existence of a refund program is not determinative to establish standing—much less a refund program that does not apply to all class members. The facts of this case and applicable case law make clear: Plaintiffs possess Article III standing.

**B.**      ***Notice of Plaintiffs' Claims.***

Whether notice of Plaintiffs' claims were "adequate" is a question of fact. There is no dispute Abbott was subject to numerous investigations at AN-Sturgis regarding the possibility of contamination dating back to 2018. In fact, the conditions at AN-Sturgis were reported by FDA as "shocking" and "egregiously unsanitary." The February 2021 Whistleblower Report further underscores the contamination issues. Abbott went so far as to destroy certain infant formula because of potential contamination and instituted a "precautionary recall" and refund program. In other words, Abbott knew it had a very serious problem with very serious consequences.

The series of events leading to the filing of this case are paramount. For example, in Illinois allegations of actual knowledge (see above) are an exception to pre-suit notice. In Michigan, Ohio, Pennsylvania, and Tennessee, the filing of a complaint satisfies the pre-suit notice requirement altogether. But even if actual notice was not enough, Plaintiffs' January 2023 written notices prior to filing the Amended Complaint—coupled with the practical reality of the *temporary* dismissal of the implied warranty claims—provide reasonable notice regarding Plaintiffs' claims.

One of the purposes of pre-suit notice is to afford a defendant the ability to rectify the alleged harm (i.e., settle the case before it is filed). While Abbott strenuously objects to the form and timing of the notice it received regarding claims in this case, it fails to reveal how it would make *any* difference in its litigation strategy of discounting Plaintiffs' claims and denying

10

culpability for is conduct at AN-Sturgis. Moreover, dismissal of the implied warranty claims because notice was not technically given before the original complaint was filed would be temporary and mechanically cumbersome. This only strengthens the notion that Abbott's actual knowledge is sufficient.

### C.     *Plaintiffs' Consumer Protection Act Claims.*

Characterizing Plaintiffs' claims as "mere puffery," Abbott argues Plaintiffs failed to provide the "what," "when," "where," and "how" of their Consumer Protection Act claims. Setting aside the notion that relevant facts peculiarly within Abbott's knowledge obviate Rule 9(b)'s particularity requirement, Plaintiffs sufficiently placed Abbott was on notice of its alleged misrepresentations (i.e., fraud). For example, Plaintiffs plead the following:

> *What*: Abbott knowingly withheld information from consumers, doctors, and regulators concerning the substantial risk of contamination of the Class Products throughout the Class Period;

> *When*: FDA Form 483 notes as early as 2018 until the ultimate "voluntary recall" and plant closure in February 2022, that Abbott operated AN-Sturgis in a manner that created the risk of bacterial contamination to its products;

> *Where*: Abbott's packaging labels, marketing and promotional materials, and internet sites repeatedly asserted that its infant formula was safe and effective for its intended use; and

> *How*: Abbott told US consumers that its powdered infant formula products were safe for their intended use when they were not—while knowing the AN-Sturgis facility increased the risk of bacterial contamination due, in part, to Abbott's routine failure to conduct appropriate testing and inspection prior to distribution.

These allegations establish a plausible claim that Abbott misrepresented the safety of its products to consumers.

This is not "mere puffery." This is a years-long pattern and practice of misrepresenting and suppressing vital safety information from consumers, doctors, and regulators. To suggest the DOJ opened a criminal investigation and ordered the plant shut down based on little more than "puffery"

11

entirely ignores the facts: 1) Abbott failed to properly ensure its products could not become adulterated; 2) contamination outbreaks occurred between 2019 and 2022; 3) Abbott failed to properly maintain clean work spaces and surfaces; and 4) Abbott failed to follow industry standards of cleanliness.

What did Abbott do with these facts? It told consumers: "As a leader in nutrition science, research and development, our goal is to deliver nutrition products and education that meet the changing needs of families across the world"—read: puffery.

### D. Plaintiffs' Unjust Enrichment Claims.

Abbott's attempt to dismiss Plaintiffs' equitable claims for unjust enrichment presents the illogical fallacy of "Heads I win, tails you lose." While arguing that alternative adequate remedies other than unjust enrichment exist for Plaintiffs' economic claims, Abbott then argues Plaintiffs failed to plead the lack of an adequate remedy. This reasoning entirely ignores that alternative theories of liability, such as unjust enrichment, survive a motion to dismiss.

Plaintiffs properly pled unjust enrichment—that Abbott unjustly retained a benefit at the expense of Plaintiffs. For example, Plaintiffs paid Abbott for the Class Products which were— unbeknownst to Plaintiffs—at risk of contamination. While doing so, Abbott concealed the risks associated with the Class Products at AN-Sturgis yet received and retained the full purchase price from Plaintiffs.

The facts surrounding Abbott's years-long conduct which ultimately lead to product contamination at AN-Sturgis is nothing short of shocking. Equally shocking is Abbott's contention that no Plaintiff, anywhere, incurred any economic harm by purchasing AN-Sturgis products during the Class period. Abbott is wrong. As such, Plaintiffs respectfully request the Court deny Abbotts' motion.

12

## STANDARD OF REVIEW

On February 27, 2023, Abbott moved to dismiss. In *Twombly* and *Iqbal*, the Supreme Court held to evade a motion to dismiss the complaint need contain only "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); and "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2019). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Stated differently, to survive a motion to dismiss, a plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Plaintiffs here clearly achieve this threshold.

## ARGUMENT

## I.     THEORIES OF HARM.

### A.     *Plaintiffs and the Class Possess Article III Standing.*

> 1.     *Plaintiffs' Amended Complaint establishes Article III standing given it sets forth a plausible claim that Plaintiffs suffered a "traditional tangible harm" in the form of economic loss.*

Defendant initially contends Plaintiffs lack standing to sue. To establish standing, the "[p]laintiff must show: (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203

(2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, (1992)).[7] Commenting on "injury in fact," Justice Kavanaugh posited: "What makes a harm concrete for purposes of Article III? As a general matter, the Court has explained that 'history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider.'" *Id.* at 2204. Describing the types of injuries that establish standing the Court noted, "The most obvious are traditional and tangible harms, such as physical harms and *monetary harms." Id.* (emphasis supplied). In short, where a plaintiff alleges, they experienced a "monetary harm"—as Plaintiffs do here—the complaint readily establishes standing.

Implicitly recognizing that Plaintiffs pled a "traditional tangible harm" in the form of "monetary harm," Abbott pivots to a contention that Plaintiffs' harms are effectively too remote to be actionable. This gist of Abbott's argument is that standing does not exist here because Plaintiffs cannot establish that every can of infant formula contained contaminated product. Dkt. No. 94-1, at 29-30. Abbott is wrong. As the First Circuit recently observed, an allegation of "monetary harm" stemming from a defective product sufficiently confers standing irrespective of whether the individual plaintiff's actual product was defective. *See In re Evenflo*, 54 F.4th 28 (1st Cir. 2022). Similarly, this Court reached a nearly identical outcome in a case involving antiperspirant where some, but not all, of the products included a carcinogen holding, "[Plaintiff] alleges that she was deprived of the benefit of her bargain, in that she would not have purchased

---

[7] Defendant rightly argues Plaintiffs bear the burden of establishing standing. Dkt. No. 94-1, at 29. Additionally, Defendant's brief focuses on the "injury in fact" prong. *Id.* at 29-30. As such, Plaintiffs limit their response to that element. That said, the remaining two elements are readily identified in the AC. Specifically, the AC readily establishes the "injury was likely caused by the defendant." For example, the AC outlines numerous examples of unsanitary conditions at AN-Sturgis that lead to the bacterial contamination in Abbott's products and ultimate "voluntary recall." *See generally* AC ¶¶ 62-77, 92-106. Similarly, given Plaintiffs seek economic loss stemming from the amount they allegedly overpaid for potentially contaminated products, there is no real argument "the injury" cannot be "redressed by judicial relief."

the products, or would not have purchased them for the listed price, had she known they contained a human carcinogen . . . this is a sufficient allegation of an injury in fact." *Barnes v. Unilever U.S., Inc.*, 2022 WL 2915629, at *1 (N.D. Ill. July 24, 2022) ("*Barnes I*"). Simply put, a complaint alleging the plaintiff suffered "monetary harm" and therefore did not receive the "benefit of the bargain" is sufficient to confer Article III standing.

Substantively, Abbott principally relies on *Spokeo v. Robins*, 578 US 330 (2016), contending that in order to claim "benefit of the bargain" damages, each class member must make a particularized showing that they bought a contaminated product. Dkt. No. 94-1, at 28-29.[8] At the outset, *Spokeo* did not analyze a "benefit of the bargain" theory of loss. As such, *Spokeo* provides little to no guidance as to the proper outcome here. And even if it had, in *Ramirez*, the Supreme Court confirmed allegations of monetary loss "readily qualify as concrete injuries under Article III." *Ramirez*, 141 S. Ct. at 2203-04. But while *Ramirez* unequivocally confirmed economic injury cases confer Article III standing, much like *Spokeo*, it too was not a "benefit of the bargain" case.

As such, the question for this Court is: Does a Complaint establish Article III standing where the plaintiff seeks recovery of monetary loss where some, but potentially not all, of the products were defective? The answer is: Yes. Specifically, both the Seventh and First Circuits *do provide* direct guidance and confirm a plaintiff who alleges economic loss emanating from a "benefit of the bargain theory" establishes both Article III standing and injury in fact. *Infra* p. 16. Here, the AC pled economic injury as a result of the Class purchasing potentially contaminated formula. AC ¶¶ 8, 15. Put another way, the difference between what the formula cost Plaintiffs, and what benefit it actually provided, represents a tangible loss sufficient to trigger standing. In *In*

---

[8] It repeats this argument as to the ICFA claims in particular. *Id.* at 33. It then argues that the recall alone cannot serve as a basis for any economic loss claim. *Id.* at 37. Finally, it argues that the existence of the refund program is sufficient to preclude standing. *Id.* at 42.

*re Evenflo*, the First Circuit faced this exact issue. After conducting an exhaustive review of Circuit

Court authority, the Court found standing, notwithstanding the fact that the alleged defect had not

manifested in every purchased product, concluding:

> Evenflo, supported by its amici, argues that this body of precedent recognizing
> overpayment injuries is in tension with the Supreme Court's recent decisions in
> *Spokeo v. Robins*, 578 U.S. 330 (2016), and *TransUnion*. Those decisions examined
> the concreteness requirement for injury in fact, reaffirming that the injury must be
> "real, and not abstract." *TransUnion*, 141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S.
> at 340); *see id.* at 2204-07; *Spokeo*, 578 U.S. at 340-43. Contrary to Evenflo's
> argument, the decisions made clear that monetary harms such as those alleged here
> fall firmly on the real, concrete side of the divide. *TransUnion* in fact described
> "monetary harms" as "traditional tangible harms" that "readily qualify as concrete
> injuries under Article III," and contrasted such harms with more abstract—although
> still concrete—forms of injury, such as "reputational harms, disclosure of private
> information, and intrusion upon seclusion." 141 S. Ct. at 2204. Nothing in
> *TransUnion* indicated that some monetary harms are concrete while others are not;
> the Court there held that properly pleaded monetary harms—like those asserted by
> the plaintiffs here—are sufficiently concrete, as compared to other, nonmonetary
> forms of injury, which may or may not be concrete. *See id.*; *see also Gustavsen*,
> 903 F.3d at 8 (explaining that overpayment injuries involve "actual economic loss,
> which is the prototypical concrete harm," even after *Spokeo*). *TransUnion* and
> *Spokeo* support the plaintiffs' standing.

*In re Evenflo*, 54 F.4th at 38-39. In doing its Circuit-by-Circuit analysis, the First Circuit

acknowledged Seventh Circuit precedent clearly recognized overpayment as an injury for standing

purposes. *See In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 750-51 (7th Cir. 2011). Like here,

*Aqua Dots* held that parents who bought, but whose children were uninjured by, a defective toy

had standing to sue based on a "financial [injury]: they paid more for the toys than they would

have, had they known of the risks the [toys] posed to children." *Id.* at 751.

Moreover, this Court recently considered this same scenario in a class action regarding

benzene in antiperspirant products. *See generally Barnes I* and *II*. In *Barnes*, plaintiffs pursued

economic loss relating to products that were potentially contaminated with benzene (a known

carcinogen). In denying defendant's motion to dismiss—twice—this Court noted "it is irrelevant

if only some of the products were contaminated," and endorsed plaintiffs' economic loss claims

based solely on the claim plaintiffs would not purchase a product due to a risk of contamination. *Barnes II*, at *5; *see also Barnes I*, at *1-2 (an earlier decision in the same action holding an economic injury may suffice to resolve the standing issue). Simply stated, where a plaintiff alleges—as Plaintiffs do here—they paid more than they otherwise should for a defective product, standing exists.

Although not binding precedent, the Northern District of Georgia encapsulated this concept in *Carder v. Graco Children's Products, Inc.*, 558 F. Supp. 3d 1290, 1305-06 (N.D. Ga. 2021). *Carder* involved a claim where the plaintiffs alleged that Graco's child safety seat was unsafe during a side-car collision. Like here, the plaintiffs sought economic loss stemming from the premium they paid for the car seat. Many, if not most, of the Class were not involved in side-impact collisions. Graco moved to dismiss, as Abbott does here, contending the alleged injury was "merely hypothetical" and, as such, the plaintiffs lacked standing. *Id.* Citing Eleventh Circuit precedent, the *Carder* Court easily dispatched this argument stating:

> The Court is not persuaded by these arguments and disagrees with Defendant on this issue. Under the Eleventh Circuit's decision in *Debrernardis*, "an economic injury qualified as a concrete injury" and "[a] person experiences an economic injury when, as a result of a deceptive act or practice, he is deprived of the benefit of his bargain."

*Carder*, 558 F. Supp. 3d at 1306 (citing *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1084 (11th Cir. 2019)). Ultimately, the court found standing given plaintiffs' allegations they would not have purchased the booster seats or paid less for them, had they known the truth about the booster seats' functionality and safety. *Id.* at 1307. The economic injury in *Carder* derived from the mere risk of injury the defective product posed to children. There is no distinction between the injuries in this case and those set forth in *Carder*. Put another way, standing exists if the basis of the claim is that the plaintiff incurred economic harm after purchasing a defendant's defective product at retail pricing.

17

Here, the AC readily pleads facts sufficient to satisfy this threshold. For example, the AC established Plaintiffs purchased potentially contaminated products that were produced at AN-Sturgis. AC at ¶¶ 4-8. The AC further notes, Plaintiffs paid "retail" for products emanating from AN-Sturgis. AC ¶ 111. And because of purchasing the potentially defective product, pled they suffered economic loss as the injury-in-fact given:

1.  Plaintiff would not have paid the purchase price for the products had they known the products were at substantial risk of being contaminated;

2.  As a result, Plaintiffs suffered injury in fact when they spent money to purchase the Class Products, which they would not otherwise have spent absent Defendant's misconduct; and

3.  Plaintiffs further suffered injury in fact as the Class Products *had diminished value* due to the risk of the alleged bacterial contamination.

*See* AC at ¶ 15 (emphasis supplied). As in *Barnes I-II*, *In re Aqua Dots*, and *In re Evenflo*, all of which Abbott ignores in its motion, these facts are sufficient to confer Article III standing.

> 2.  *The case law Abbott relies upon is not compelling and worse ignores binding Seventh Circuit precedent.*

The case law Abbott relies upon does not support a basis to conclude Plaintiffs lack standing. For example, Abbott cites *Bria Health Services v. Eagleson*, 950 F.3d 378 (7th Cir 2020) for the proposition that the risk of future harm is insufficient to establish standing. In *Bria*, the class consisted of consultants to nursing homes, who sought to represent the interests of the nursing home residents who, the consultants alleged, were at risk of discharge based on certain of defendants' regulations. *Id*. at 380. First, the Court found the consultants had no standing to bring the claim on behalf of third parties under the regulatory scheme (a fact that is not remotely relevant to this case). *Id*. at 385-86. Second, even if the residents themselves brought the claim, at oral argument class counsel conceded that no members were actually discharged, and all were still receiving medical care. *Id*. As such, the Court found no standing to sue under a theory that someone

18

might (someday) violate federal law. *Id*. Unlike here, there was no alleged harm *that was actually experienced* by the plaintiff. In short, the basis for dismissal was predicated upon no harm at all, as opposed to actual diminished value of a product due to an inherent defect. *Id.* Plainly stated, the case is neither analogous nor compelling.

Nor is Abbott's reliance on *In re Gerber Products Co. Heavy Metal Baby Food Litig.*, 2022 WL 10197651 (E.D. Va. 2022) particularly impactful. Defendant cites *Gerber* for the same proposition (i.e., an absence of an actual injury). Specifically, the *Gerber* Court dismissed the complaint *after* class counsel conceded they made "no allegations the baby food products were adulterated, contaminated, or the cause of any reported injuries." *Id.* at *7. Conversely, here the AC, unlike the complaint in *Gerber*, alleges the formula *was* contaminated and adulterated. AC ¶ 1. As a result—like the plaintiffs in *Barnes*, *In re Evenflo*, and *Carder*—Plaintiffs here allege a present injury predicated on actual economic loss stemming from a defective product. Specifically, every Plaintiff purchased infant formula made by Abbott at AN-Sturgis's contaminated facility. AC ¶ 4. Plaintiffs specifically pled that they "[p]urchased [Abbott's] products on the assumption that the labeling was accurate and that the products were unadulterated, safe and effective." *Id.* at ¶ 15. That was not the case given FDA's conclusion—as well as Abbott's admission—that bacterial contaminants were present at the AN-Sturgis facility. *See* Form 483 at 1-2. As such, Plaintiffs (and the Class) did not receive the "benefit" of their bargain given the product emanated from a plant that was awash in biological contaminants (i.e., products that were not "unadulterated, safe and effective"). *Id.* at ¶ 99. Given Plaintiffs alleged they, "would not have paid the purchase

price for the products had they known the products were at substantial risk of being contaminated" (*id.* at ¶ 15) these facts are sufficient to confer standing and evidence injury in fact.[9]

### 3. *Actual Injury Exists.*

Next, Defendant argues the Court should dismiss the ICFA claim (and purportedly all CPA claims notwithstanding the fact it failed to conduct a state-by-state analysis) because Plaintiffs cannot establish "actual injury." Dkt. No. 94-1, at 33. Specifically, Abbott contends that even if Plaintiffs pled Article III standing and injury-in-fact, they must go further and plead an "actual injury"—ostensibly something beyond an "injury in fact"—occurred. At the outset, Plaintiffs *did plead* an "actual injury" in the form of "actual" out-of-pocket loss stemming from their purchase of Abbott's biologically contaminated products. And even if that was not enough to end the inquiry, this Court's rationale in *Barnes II* certainly is. Specifically, in *Barnes II*, Unilever, like Abbott does here, "contend[ed] that Barnes's claims must be dismissed because she has not alleged that she suffered actual damages, which Unilever argues is a required element of her claim." *Barnes II*, at *4. Barnes, like Plaintiffs here, sought recovery under the ICFA. This Court plainly rejected defendant's argument holding: "[A]ctual loss may occur if the seller's deception deprives the plaintiff of 'the benefit of her bargain' causing her to pay 'more than the actual value of the property.'" *Id.* (citations omitted).[10] Accordingly, this Court allowed Barnes' ICFA claim to proceed.

---

[9] Nor are *Vuotto v. Abbott*, 2011 WL 3876923 (N.D. Ill. 2011) or *Jasper v. Abbott*, 834 F. Supp. 2d 766 (N.D. Ill. 2011) impactful. At the outset, both cases predate *AquaDots* and were ultimately based upon Pennsylvania's economic loss doctrine and Indiana's reliance law. In fact, neither case contains any discussion of Article III standing.

[10] To the extent the Court's view in *Castillo v. Unilever*, 2022 WL 704809 (N.D. Ill. 2022) differs from this Court's analysis in *Barnes II*, Plaintiffs suggest the better reasoned rationale is contained in *Barnes II*. This is particularly true given: 1) the majority rule (which this Court cited at length in *Barnes II*, including reference to Illinois Supreme Court law) supports this outcome; and 2) because Article III establishes a minimum standard for standing (albeit in federal court), it is

This Court's rationale in *Barnes II* stands on solid ground, reflecting the majority rule. For example, Judge Furman of the Southern District of New York recently performed an extensive analysis of "actual injury" under state common and statutory law in situations where a consumer alleges economic loss stemming from the purchase of a product with an unmanifested defect. *See In re General Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262, 276 (S.D.N.Y. 2018). Ultimately, he concluded:

> Having now engaged in such an analysis of the law *in twenty-seven states*, covering three different kinds of claims (statutory consumer protection, common-law fraud, and implied warranty), the Court can no longer say with confidence that, across the states, the "majority view" is that manifestation is required to state claims for fraud, violations of consumer protection statutes, and breaches of warranty. *Indeed, for every disputed claim in every disputed state, the Court concludes that manifestation is not a requirement*. This is due in part to the Court's determination that, in the absence of state law to the contrary, there is no legal or logical ground to bar Plaintiffs' recovery if they can prove that they suffered economic loss.

*Id.* (emphasis supplied). Judge Furman further stated, "while manifestation may be helpful in proving the presence of a defect, it does not follow that recovery for economic loss should turn on whether the defect also caused property or personal damage" because if a plaintiff can demonstrate that knowledge of a defect would cause the value of the product to drop, and that the product purchased was consequently worth less than what the plaintiff paid for, then the plaintiff has demonstrated that they lost the benefit of their bargain. *Id.* at 276-77. Turning to GM's "actual injury" argument (the same Abbott makes here), the court stated, "GM puts too much weight on the term 'actual damages,' which 'has often been defined broadly in common-law cases, and in

---

questionable whether a state court standard governing standing that exceeds that threshold would violate the Constitution's Supremacy Clause. *See Common Cause Indiana v. Lawson*, 978 F.3d 1036, 1041 (7th Cir. 2020) (noting in *dicta* "[o]nce a state creates courts of general jurisdiction with authority to hear claims, the Supremacy Clause forbids eliminating jurisdiction for only a particular type of lawsuit" otherwise "[t]he result would be to immunize would-be defendants from litigation in state court"). That said, this Court need not wade into those waters given the Complaint readily establishes an "actual injury."

[United States Supreme Court cases], to include all compensatory damages.'" *Id.* (quoting *FAA v. Cooper*, 566 U.S. 284, 299 (2012)).[11]

Similarly, in *Morning Song Bird Food Litig.*, the defendant argued that plaintiffs did not sustain actual injuries because "they bought the product, used it and reported no problems." *In re Morning Song Bird Food Litig.*, No. 12-cv-1592 JAH (RBB), 2013 WL 12144051, at *3 (S.D. Cal. Sept. 30, 2013). Plaintiffs countered that the bird food may contain pesticides and, as such, they overpaid for it. *Id.* The court held the plaintiffs' benefit of the bargain theory constituted actual damages under California's CLRA, UCL, and FAL. *Id.* at *5. The court further held the ICFA recognized a benefit of the bargain theory to actual damages. *Id.* (citing *Kim v. Carter's Inc.*, 598 F.3d 362 (7th Cir. 2010)); *see also Aliano v. Louisville Distilling Co., LLC*, 115 F. Supp. 3d 921, 931 (N.D. Ill. 2015) (stating "there is actual injury [under the Illinois CFA] when the plaintiff suffers a pecuniary loss by receiving goods that are worth less than was promised"); *Geske v. PNY Technologies, Inc.*, 503 F. Supp. 3d 687, 708 (N.D. Ill. 2020) ("When an individual consumer brings an ICFA claim, actual loss may occur if the seller's deception deprives the plaintiff of the benefit of her bargain by causing her to pay more than the actual value of the property.") (internal quotations omitted).[12]

---

[11] Based on this, the court held that consumers showed "actual injury" with a benefit of the bargain theory and no manifestation of a defect under the consumer protection statutes of Arizona, Connecticut, Kansas, Ohio, Tennessee, and West Virginia. *Id.* at 280, 285-93. Likewise, the same court held that implied warranty claims under Ohio and West Virginia law did not require manifestation of a defect to show "actual injury." *Id.* at 306.

[12] Not surprisingly, numerous other courts from around the country reach the same conclusion. *See In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 424 (E.D. Va. 2020) (benefit of the bargain theory constitutes actual damages under Florida's DUTPA; *Holman v. Ali Industries, LLC*, 2023 WL 1438752, at *5 (W.D. Mo. Feb. 1, 2023) (benefit of the bargain theory establishes actual damages under Missouri's MPA); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 492, 494 (D. Md. 2020) (consumers alleged risk of future injury).

Here, Plaintiffs' Amended Complaint unequivocally pled actual, pecuniary loss; these allegations establish "actual harm"—period, end of story. *See* AC ¶¶ 1, 8, 10, 15, 111, 112, 114. Equally important, the allegations are sufficient to establish "actual harm" notwithstanding Abbott's repeated claim its products did not "harm" Plaintiffs. That is because this is an economic loss case, not a personal injury case. The economic injury incurred here is the complete or partial diminution in value of Defendant's formula due to the risk of injury the products posed to children. Each and every Plaintiff alleges they would not have purchased the Class Products, paid less for the Class Products, or would have paid for an alternative because of the risk of contamination. AC ¶¶ 16-41. That is sufficient to establish "actual harm." Defendant's argument to the contrary ought to be rejected.

### B. Abbott's Contention that Plaintiffs are Predicating Liability Exclusively on the Fact a Recall Occurred, or that Plaintiffs are Seeking Damages Beyond the Diminution in Value to the Cost of the Formula is Wrong.

Next, based on one sentence in a 162-page Amended Complaint, Abbott contends Plaintiffs are pursuing a theory predicated solely on the presence of the recall and/or seeking damages beyond the diminished value for the sales price or formula. Plaintiffs are making no such claim (either to support an alleged remedy or assert damages beyond those set forth herein). In fact, Paragraph 15—the purported origin of the "Recall Theory" states on three separate occasions that the "injury in fact" is the inflated costs of contaminated formula. Specifically, it pleads the following: "1) Plaintiff would not have paid the purchase price for the products had they known the products were at substantial risk of being contaminated; 2) as a result, Plaintiffs suffered injury in fact when they spent money to purchase the Class Products, which they would not otherwise have spent absent Defendant's misconduct; and 3) Plaintiffs further suffered injury in fact as the Class Products *had diminished value* due to the risk of the alleged bacterial contamination." *See* AC at ¶ 15 (emphasis supplied). Even then, the sentence Defendant contends launched the "radical

23

theory" makes clear the basis for Plaintiffs' claim is that that they were "[f]orced to pay more than they would have otherwise paid for infant formula. . . ." Ultimately, this case is about the amount of money Plaintiffs paid for Defendant's products and whether or not that cost was reasonable. To the extent Defendant interpreted one sentence out of a 162-page Amended Complaint to mean otherwise, it is incorrect.

### C. The Refund Program Does Not Affect Article III Standing.

Abbott argues that the existence of a refund program completely removes Article III standing from the entire Class. At the outset, the vast majority of the Class is, by definition, not eligible for the refund given they used the product long before the recall or refund program. In short, the refund program did not offer refunds to the entire Class throughout the entire class period. That is certainly true for the individual Plaintiffs who uniformly pled they used the product—in many cases long before Abbott finally acknowledged the severe health risks associated with production at AN-Sturgis—and, as such, were not eligible to receive the refund. *See generally* AC ¶¶ 16-41.[13] For example, Abbott extended its refund program only to certain lots of contaminated products over a certain time period, which the Plaintiffs did not receive.[14] In short, Abbott's contention Plaintiffs are entitled to participate in the refund program is simply not accurate. As a result, the presence (or lack thereof) of a refund program has no impact of Plaintiffs' standing to seek relief.

---

[13] This, in and of itself, is fatal to Abbott's defense—a point reinforced by the case law it relies upon. Specifically, the case law Abbott cites predominantly involve motor vehicle defects where the manufacture put in place a refund program *impacting all* class members irrespective of use. *See, e.g.*, *Sharp v. FCA*, 2022 WL 14721245 (E.D. Mich. 2022), *Flores v. FCA*, 2020 WL 7024850 (E.D. Mich. 2020); *Sagaswara v. Ford*, 2019 WL 3945105 (N.D. Cal. 2019). The sole non-vehicular case, *Charlton v. LG Energy Sol. Mich. Inc.*, 2023 WL 1420726 (S.D. Cal. 2023) also involved a replacement program that was offered to the entirety of the class.

[14] http://www.similacrecall.com/US/en/refund-faqs.html (last visited March 23, 2023)

Beyond that, and not surprisingly, there are numerous courts that reach this exact conclusion; namely, the presence of a "refund program" is not determinative of whether standing exists. For example, in *Adam v. Barone*, 41 F.4th 230, 235 (3d Cir. 2020), the Third Circuit ruled that the mere existence of a recall program has no impact on class members' Article III standing, stating that "Defendants merely offered what they believed would make Adam whole," and "[a]s every first-year law student learns, the recipient's rejection of an offer 'leaves the matter as if no offer had ever been made.'" *Adam*, 41 F.4th at 235 (citing *Campbell-Ewald Co v. Gomez*, 577 US 153, 162 (quoting *Genesis Healthcare Corp v. Symczyk*, 569 US 66, 81, 133 S. Ct. 1523, 185 L. Ed. 2d 636 (2013) (Kagan, J., dissenting)). Similarly, in Illinois a plaintiff has standing to pursue her claims notwithstanding an offer of a full refund. In *Rudy v. Family Dollar Stores*, 583 F. Supp. 3d 1149 (N.D. Ill. 2022), the plaintiff represented a putative class seeking economic compensation for their purchase of smoked almonds which were not fire roasted. Among its defenses, Family Dollar argued that its refund program eliminated standing. The court disagreed, citing a long string of authority establishing the existence of a refund program does not deprive a plaintiff of standing under the ICFA. *Id.* at 1160-61.[15] Ultimately, the existence of a refund program—particularly one

---

[15] As set forth throughout, Plaintiffs seek certification of a national class under the ICFA. As to the remainder of Plaintiffs' causes of actions, numerous jurisdictions represented in the AC do not construe a refund program as affecting Plaintiffs' standing. *Verde v. Stoneridge, Inc.*, 137 F. Supp. 3d 963 (E.D. Tex. 2015) (finding that a recall program did not moot plaintiff's claims on grounds that "a live controversy remains because [plaintiff] seeks recovery that exceeds what [defendant] offers in the recall"); *Martin v. Ford Motor Co.*, 765 F. Supp. 2d 673 (E.D. Pa. 2011) (finding that a recall program did not moot plaintiff's claims because the court could award money damages and order "a more expansive remedy than the one proposed in the Recall"); *Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 627 (7th Cir. 2017) (finding that an unaccepted refund offer made prior to suit does not deprive plaintiffs of standing); *In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1117 (C.D. Cal. 2008) ("[U]nilateral offering of a remedy by a defendant does not change the fact that a plaintiff has been injured."); *Martelack v. Toys R Us*, No. 13-7098, 2016 WL 762656, at *3 (D.N.J. Feb. 25, 2016) (defendant's unaccepted tender of a check did not moot plaintiff's unpaid wage claims against employer) (citing *Gomez*, 577 U.S. at 165-66); *Hill v. LLR, Inc.*, No. 18-120, 2019 WL 2404900, at *5-6 (D. Mont. Mar. 8, 2019) ("Unlike the plaintiff in Hamilton, Hill alleges

that does not affect the entire class—cannot serve to deprive the putative class members of standing.

## II.     PLAINTIFFS' CLAIMS ARE VIABLE.

### A.     *Plaintiffs Properly Pled Breach of the Implied Warranty of Merchantability.*

#### 1.     *Abbott possessed sufficient notice of Plaintiffs' breach of implied warranty claims.*

Abbott seeks dismissal of Plaintiffs' breach of implied warranty of merchantability claims for the states of Arkansas, Connecticut, Florida, Maryland, Michigan, Missouri, Ohio, South Carolina, Tennessee, and Texas because the Plaintiffs in those actions allegedly did not provide adequate notice before filing their underlying actions. Abbott also seeks dismissal of the Illinois and Pennsylvania Plaintiffs' implied warranty claims even though they provided notice before filing their underlying actions because it was not given sufficient time to respond.[16] Plaintiffs provided sufficient notice because: 1) Abbott had actual knowledge of facts supporting a breach of the implied warranty; 2) the Michigan, Ohio, Pennsylvania, and Tennessee Plaintiffs provided notice by filing suit; 3) the Florida Plaintiffs had no obligation to notify a manufacturer like Abbott; and 4) the issue of whether notice was adequate is a question of fact.

The AC clearly establishes Abbott had actual knowledge of its potentially contaminated formula. For example, Abbott was subject to prior investigations at AN-Sturgis for the risk of

---

ascertainable loss beyond the amount of the refund based on the temporary deprivation of money and the fact that she has not been compensated for the lost time value of that money."), *report & recommendation adopted as modified on other grounds*, 2019 WL 3024896 (D. Mont. July 11, 2019).

[16] Notice of implied warranty claims is a technicality that some states have adopted as part of their UCC before a consumer can plead a breach of implied warranty claim. Practically speaking, this requirement is not dispositive of the implied warranty claims before the Court. Dismissal of these claims leaves other consumers free to provide the sufficient notice, which Abbott will likely ignore, leading them to file new actions which will then be consolidated as part of this MDL. Nevertheless, Plaintiffs have satisfied the UCC notice requirement.

contamination between 2018-2022. AC ¶¶ 63-68. Abbott had substantial evidence of potential contamination in September 2021 and failed to inform consumers like Plaintiffs. AC ¶¶ 67-71. Abbott previously destroyed infant formula in connection with contamination issues. AC ¶ 73. Abbott knew of a Whistleblower Complaint detailing the dangers and risk of contamination at AN-Sturgis as far back as February 2021. AC ¶¶ 94-96. Finally, FDA Commissioner Dr. Robert Califf described the conditions at the plant as "shocking" and "egregiously unsanitary." AC ¶¶ 100-101. In short, there is no basis to conclude Abbott was "unaware" that its products were susceptible to biological contamination yet took no action to remedy the problem for years. Put another way, Abbott was plainly "on notice" that its products did not meet the implied warranty of merchantability.

Beyond that, a careful review of the law establishes that in a case like this—where the defendant had "actual notice" of the alleged breach—the law does not require technical notice to proceed. The following represents an overview of notice law in the relevant states:

*Illinois:* In *Rust-Oleum*, Judge St. Eve held that the issue of adequate notice was an issue of fact not to be resolved at the motion to dismiss stage, especially where plaintiffs pled actual knowledge on behalf of the defendant and there were differences in state law regarding proper notice. *See In re Rust-Oleum Restore Mktg., Sales Prac. & Prod. Liab. Litig.*, 155 F. Supp. 3d 772, 799-802 (N.D. Ill. 2016). *Rust-Oleum* involved a case where the plaintiffs alleged the defendant knew (or should have known) the product would not meet the claims, promises, and representations the company made to consumers, and that it possessed years of consumer complaints demonstrating the need to repair and/or replace the product. *Id.* at 800. The court found these allegations "sufficient at this early stage to allege an exception to pre-suit notice based on

Rust-Oleum's knowledge of the issues with Restore products sold to Plaintiffs and the putative class." *Id.*

Here, Plaintiffs sufficiently allege Abbott's actual knowledge of potential contamination to its products. *See supra* pp. 2-8. Abbott's "egregiously unsanitary" conditions at AN-Sturgis gave it actual notice that its products did not meet the claims, promises, and representations it made to consumers regarding product safety. Moreover, Abbott is privy to information that ordinary consumers are not—i.e., the conditions at its facilities, complaints from consumers regarding illness or death, and investigations by state and federal health agencies. At this stage, Plaintiffs sufficiently pled that Abbott possessed actual knowledge of a breach of the implied warranty of merchantability.

*Michigan, Ohio, Pennsylvania, and Tennessee*: Courts in Michigan, Ohio, Pennsylvania, and Tennessee have held that filing a complaint satisfies the pre-suit notice requirement for breach of warranty claims under the UCC. *See generally Carder v. Graco Children's Products, Inc.*, 558 F. Supp. 3d 1290, 1314 (N.D. Ga. 2021) (filing of complaint sufficient notice under Ohio and Pennsylvania law); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 975-76, 978 (N.D. Cal. 2014) (holding that under Ohio and Pennsylvania law, filing a complaint serves as notice of breach); *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. 03-4558 (GEB), 2010 WL 2813788, at *39, *65 (D.N.J. July 9, 2010) (complaint provided sufficient notice under Pennsylvania and Michigan law); *In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*, 155 F. Supp. 2d 1069, 1110 (S.D. Ind. 2001) (complaint supplied sufficient notice under Michigan and Tennessee law). As such, Plaintiffs' complaint satisfied the notice requirement for Michigan, Ohio, Pennsylvania, and Tennessee.

*Florida*: In Florida, a plaintiff is not required to give notice to a manufacturer like Abbott. *See In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d at 977 (citing *Fed. Ins. Co. v. Lazzara Yachts of N. Am., Inc.*, No. 8:09-CV-607-T-27MAP, 2010 WL 1223126, at *5 (M.D. Fla. Mar. 25, 2010)); *Felice v. Invicta Watch Company of America, Inc.*, No. 16-CV-62772-RLR, 2017 WL 3336715, at *6 (S.D. Fla. Aug. 4, 2017) (stating "Florida courts recognize 'that notice is required to be given to the seller, not the manufacturer, under Florida law.'"). Given Abbott is a manufacturer of formula, Plaintiffs were not required to provide notice to Abbott of a breach of the implied warranty.

Lastly, whether Plaintiffs provided reasonable notice is a question of fact. *See Datil v. C.R. Bard, Inc.*, No. 19 C 8274, 2020 WL 5810402, at *6 (N.D. Ill. Sept. 30, 2020) ("reasonableness is a question of fact that depends on the particular circumstances of each case"); *Francis v. General Motors, LLC*, 504 F. Supp. 3d 659, 680 (E.D. Mich. 2020) ("where the buyer gives some notice of the breach, the issues of timeliness and sufficiency are questions of fact."); *Rust-Oleum*, 155 F. Supp. 3d at 801 ("the Court finds that the allegations presented are sufficient and notes that an exhaustive review of the factual sufficiency of each Plaintiffs' allegations regarding notice under each applicable state law is not appropriate at this stage"). Here, numerous factual issues preclude a motion dismiss. They include whether: 1) Abbott had actual knowledge of the breach; 2) Plaintiffs' January 2023 written notices provided sufficient notice to Abbott; and 3) the filing of the lawsuit constituted notice in light of Abbott's "actual notice."[17] Accordingly, the Court should deny Abbott's motion predicated on lack of notice.

---

[17] This is especially true for Illinois Plaintiff Reyes, who provided notice before filing her Complaint.

2.     *Determining privity is inappropriate at the motion to dismiss stage; regardless, recognized exceptions to privity exist here.*

Abbott argues that no privity exists between Plaintiffs and the manufacturer given Plaintiffs did not purchase the products directly from Defendant. While traditionally the UCC would govern and agree, the situation here differs greatly and falls in line with recognized exceptions under Illinois and other state laws. Beyond that, it is well settled in Illinois that given "the fact-intensive nature" of the privity inquiry (*see In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993)), a determination whether privity exists is often "not appropriate at the motion-to-dismiss stage." *See Apex Mgmt. Corp. v. WSR Corp.*, 225 B.R. 640, 646 (N.D. Ill. 1998). For this reason alone, the determination of privity is inappropriate at this stage given the fact intensive review it would require for the entire MDL.

Generally, unless personal injury is alleged, "implied warranties give a buyer of goods a potential cause of action only against his immediate seller." *Rothe v. Maloney Cadillac, Inc.*, 518 N.E.2d 1028, 1029 (Ill. 1988); *see also Bd. of Educ. of City of Chi. v. A, C & S, Inc.*, 546 N.E.2d 580, 595 (Ill. 1989). However, Illinois, along with many other states, recognize various exceptions to the privity requirement. *See Frank's Maintenance & Eng'g, Inc. v. C.A. Roberts Co.*, 408 N.E.2d 403, 412 (Ill. App. 1980).[18] First, Plaintiffs fall under Illinois' (and other states') third-party privity exception.[19] Liability under the third-party beneficiary exception to privity applies "where the

---

[18] In *In re Testosterone Replacement Therapy Prod. Liab. Litig.*, No. 14 C 1748, 2014 WL 7365872, at *9 (N.D. Ill. Dec. 23, 2014) (quoting U.C.C. § 2-314)) this Court appeared to tacitly accept the third-party beneficiary theory. *In re Testosterone*, like this case, involved claims for breach of implied warranty stemming from the sale of pharmaceutical products to plaintiffs. Like here, defendants *did not* sell directly to the end-user. Nonetheless, this Court allowed the claims to proceed stating, "[p]laintiffs have sufficiently pled claims for breach of the implied warranty of merchantability. They plausibly allege that *they believed, based on defendants' misrepresentations* and inadequate warning, that TRTs were safe and effective . . . ." *Id.* (emphasis supplied).

[19] The other states Abbott lists as requiring privity in implied contract claims all outline this third-party beneficiary exception including California, Connecticut, Georgia, Florida, Kansas,

manufacturer knew the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements." *Frank's Maintenance*, 408 N.E.2d at 412; *see also In re Rust-Oleum*, 155 F. Supp. 3d at 806–07 (recognizing a direct-dealing exception). As noted below, because Plaintiffs are the intended beneficiary of Defendant's products, they satisfy the privity requirement. AC ¶¶ 430-35

Second, in *Rust-Oleum*, Judge St. Eve recognized an ancillary exception to the privity requirement where a defendant engages in a direct-to-consumer marketing campaign the plaintiff relies upon called the "direct dealing" exception. *Id*. at 806-07 (citing *Clemens v. DaimlerChrysler Corp.*, 535 F.3d 1017, 1023 (9th Cir. 2008) (noting exception to privity rule exists where "[t]he plaintiff relies on written labels or advertisements of a manufacturer.")). Turning to the plaintiffs' privity allegations, the Court observed:

> Plaintiffs have [pled privity] here, where they allege factual support for the "direct dealing" exception. Namely, Plaintiffs allege a series of well-pleaded paragraphs detailing Rust-Oleum's direct marketing campaign to consumers, including to Plaintiffs and the putative class, and additionally allege that "consumers relied upon Defendant['s] misrepresentations . . . regarding Restore, including advertisements that Restore would last ten to twelve years."

---

Kentucky, Missouri, Ohio, and Tennessee. *See Burr v. Sherwin Williams Co.*, 42 Cal. 2d 682, 695, 268 P.2d 1041, 1048 (1954) (CA); *Micci v. Thomas*, 55 Conn. App. 14, 18, 738 A.2d 219, 221 (1999) (CT); *Merino v. Ethicon Inc.*, 536 F. Supp. 3d 1271, 1286-87 (S.D. Fla. 2021) (FL); *Starrett v. Commercial Bank of Ga.*, 226 Ga. App. 598(1), 599, 486 S.E.2d 923, 925 (Ga. App.,1997) (GA); *Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233, 1243 (D. Kan. 2007) (KA); *Young v. Kenneth Jackson Elec., Inc.*, No.2005-CA-001242-MR, 2006 WL 2787077, at *2 (Ky. Ct. App. Sept. 29, 2006) (KY); *Kansas City Hispanic Ass'n Contractors Enter., Inc. v. City of Kansas City*, 279 S.W.3d 551, 555 (Mo. App. W.D. 2009) (MO); *In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*, 537 F. Supp. 3d 679, 748-49 (D.N.J. 2021) (applying Ohio law, the court refused to dismiss implied warranty claim on lack of privity grounds given a factual question remained as to whether plaintiffs could establish intended third-party beneficiary status or prove the distributor functioned as the manufacturer's agent) (OH); *Moore Construction Co., Inc. v. Clarksville Department of Electricity*, 707 S.W.2d 1, 9 (Tenn.Ct.App.1985) (TN). Connecticut courts relax the privity requirement where alternative remedies were not available, which may not become clear until additional claim-dispositive rulings. *Quadrini v. Sikorsky Aircraft Div.*, 505 F. Supp. 1049 (D. Conn. 1981).

*Id.* at 807 (internal citations omitted). Simply stated, the Court found the plaintiffs were able to defeat the motion to dismiss because they pled the existence of a direct-to-consumer marketing campaign directed toward the plaintiffs. *Id*. Like the third-party beneficiary exception, the "direct dealing" exception applies to the facts of this case. AC ¶¶ 430-34.

Here, the facts are similar to those in *Rust-Oleum*, along with similar holdings amongst all the states referenced in Defendant's Motion to Dismiss. *See supra* fn. 17. Abbott is one of the largest manufacturers of powdered infant formulas on the market. AC ¶¶ 43-47. These powdered infant formulas are produced for infant consumption and for use by parents and medical professionals with the responsibility of caring for and nurturing young infants. Abbott knowingly produces these products, including specialty formulas, for infant consumption, which is one of the most at-risk populations for sickness resulting from bacterial and other contaminations within their food source. AC ¶¶ 52-61. Often these formulas are critical for newborns and infants as they can regularly serve as a dietary supplement or complete dietary replacement to breast milk feeding for a plethora of reasons.

Here, Abbott was aware of customers' requirement that the powdered infant formulas manufactured by Abbott were safe for their infants and newborns to consume. AC ¶¶ 49-50, 55-56. In fact, Abbott advertised on its website and elsewhere its commitment to delivering safe formula. *Id*. Defendant delivered the powdered infant formula in order to satisfy that requirement, and by delivering contaminated formula to distributors, sellers, and healthcare providers, failed to meet these requirements. *Id.* ¶ 51. Plaintiffs and Abbott also had direct communications through Abbott's marketing of these powdered infant formulas to consumers in digital and physical media, as well as promotions to medical professionals to use Abbott formulas in hospitals and doctors' offices across the nation. *See, e.g.*, AC ¶¶ 157, 226, 250, 262, 278, 338, 351, 381. As Abbott itself

states: "As a leader in nutrition science, research and development, our goal is to deliver nutrition products and education that meet the changing needs of families across the world."[20] The clear implication, if not outright assertion, is that Abbott manufactures and distributes *safe and effective* products—a fact belied by the actual conditions at AN-Sturgis. Plaintiffs further alleged they relied on these representations in making their purchases. *See, e.g.*, AC ¶¶ 211, 285, 357.

In this way, Plaintiffs properly allege that consumers of powdered infant formulas are third-party beneficiaries of the contracts between Abbott and their distributors/sellers of its products, given the final consumer was always the intended beneficiary of the distribution of these powdered infant formula products. AC ¶¶ 430-35. Additionally, these facts satisfy the "direct dealing" exception set forth in *Rust-Oleum* given Plaintiffs justifiably relied on Abbott's effort to repeatedly marketed its products as safe for their intended use. *Id.* Taken collectively, Plaintiffs' allegations are sufficient to establish an exception to the privity requirement.

### 3. The Class Products were not merchantable.

"Under the Uniform Commercial Code, a seller who is a merchant with respect to the type of goods sold impliedly warrants that the goods are merchantable, which . . . means that the goods 'are fit for the ordinary purposes for which such goods are used,' 'are adequately contained, packaged, and labeled as the agreement may require,' and 'conform to the promise or affirmations of fact made on the container or label.'" *In re Testosterone Replacement Therapy Prod. Liab. Litig.*, No. 14 C 1748, 2014 WL 7365872, at *9 (N.D. Ill. Dec. 23, 2014) (quoting U.C.C. § 2-314)). "Merchantable means of a quality commensurate with that generally accepted within the trade under the description of the goods in the contract." *Brandt v. Boston Scientific Corp.*, 792 N.E.2d 296, 300 (Ill. 2003) (citing 810 ILCS Ann. 5/2-314, Uniform Commercial Code Comment

---

[20] https://nutrition.abbott/in/about-us (March 24, 2023).

2, at 186 (Smith-Hurd 1992)) (finding product unmerchantable where manufacturer's voluntary recall stated that product did not meet "standards for product performance"). The implied warranty of merchantability "arise[s] by operation of law and serve[s] to protect buyers from loss where the goods purchased are below commercial standards or are unfit for the buyer's purpose." *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992).

A product subject to recall and potential contamination is unfit for its ordinary purpose. *See In re Valsartan, Losartan, and Irbesartan Prod. Liab. Litig.*, MDL No. 2875 (RBK-JS), 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021) ("contaminated drugs, even if medically efficacious for their purpose, cannot create a benefit of the bargain because the contaminants, and their dangerous effects, were never bargained for."); *Kavon v. BMW of North America, LLC*, 605 F. Supp. 3d 622, 640 (D.N.J. 2022) (holding plaintiffs stated breach of implied warranty of merchantability claim where recall requirements rendered product unfit for intended use); *Choi v. Kimberly-Clark Worldwide, Inc.*, No. SA CV 19-0468-DOC, 2019 WL 4894120, at *11 (C.D. Cal. Aug. 28, 2019) (alleging that later recalled products were unusable was sufficient to state implied warranty claim at the pleading stage). Put another way, if Abbott's products were fit for consumption, then the federal government would not need to warn consumers not to purchase or consume them.

Further, Plaintiffs do not need to show that the products they purchased contained actual contamination to be unmerchantable. *See In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*, 155 F. Supp. 2d 1069, 1099-1101 (S.D. Ind. 2001) (holding that proof of manifestation of defect is not required at motion to dismiss stage for breach of implied warranty of merchantability); *Yachera v. Westminster Pharmaceuticals, LLC*, 477 F. Supp. 3d 1251, 1268 (M.D. Fla. 2020) (holding that plaintiffs established breach of implied warranty of merchantability claim even though they did not suffer physical injury from the products because they would not have

34

purchased the products on the same terms if they knew the products contained adulterations); *In re General Motors LLC Ignition Switch Litig.*, 14-MD-2543, 2016 WL 3920353, at *33 (S.D.N.Y. July 15, 2016) (Maryland plaintiff need not show actual product malfunction to state claim for breach of implied warranty); *In re Toyota Motor Corp. Unintended Acceleration Mktg. Sales Prac., and Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1186 (C.D. Cal. 2010) (manifestation of defect not required for California plaintiffs to state implied warranty claims). Put another way, at the pleading stage it is sufficient to allege that the product was susceptible to being biologically contaminated, which the AC clearly did. *See* AC ¶¶ 1, 8, 15. This is sufficient to evade a motion to dismiss.

Ultimately, Abbott's products were unmerchantable because they were manufactured in unsanitary and dangerous conditions and contained significant risk of contamination. *See supra* pp. 2-8. Here, had Plaintiffs known the formula was contaminated they would have: 1) paid less for formula; 2) not purchased the formula; or 3) purchased an alternative. Products subject to a nationwide recall and warnings from the federal government not to purchase or consume them cannot be merchantable. As such, Defendant's motion fails.

### 4. *The Missouri warranty claim does not fail.*

Abbott argues Plaintiff Morris's Missouri warranty claim fails for lack of a manifest defect.[21] On February 1, 2023, the Western District of Missouri evaluated the facts required to establish whether a product was "defective" so as to sufficiently plead breach of implied warranty. *Holman v. Ali Indus., LLC*, 2023 WL 1438752, at *9 (W.D. Mo. Feb. 1, 2023). Specifically, in *Holman*, the plaintiff purchased a product that had a three-year shelf-life. The industry standard

---

[21] Defendant cites *In re GM Ignition Switch Litig.*, 2016 WL 3920353, at *35 (S.D.N.Y. 2016) to support this proposition—a non-binding case from outside Missouri.

was to include an expiration date on the product. Holman argued the defendant knew the product expired after three years yet, did not supply an expiration date. *Id.* at *1. Ultimately, the court held, "Holman has alleged not only a *risk* of failure, but a manifest defect in the product that he purchased that inevitably will result in failure. Indeed, because there is no expiration date on the products, it is possible that the products expired before Holman purchased them." *Id.* at *2 (emphasis supplied). In finding a manifest defect the Court further stated: "[t]o be deemed unmerchantable, a defect must leave a product unfit for the purpose for which it was designed." *Id.* at *9.

Here, Plaintiff purchased her formula in September of 2021. AC ¶ 33. For more than two years prior to her purchase, AN-Sturgis operated and produced product in an unsanitary condition. In short, the AC establishes there was a risk of failure making the formula unfit for use *at the time of purchase. Id.* ¶¶ 62-77, 94. These risks include serious bacterial contamination—which Abbott knew of—long before Plaintiff purchased her product. As in *Holman,* the defect (i.e., bacterial contamination) "manifested" at the time of purchase. As such, Abbott's motion fails.

### B. *Plaintiffs Adequately Plead Consumer Protection Claims.*

Abbott raises two challenges to Plaintiffs' allegations that the state consumer protection act ("CPA") claims fail. First, Abbott contends Plaintiffs engaged in "boilerplate" pleading. But in doing so, it effectively relies upon "boilerplate" briefing by failing to address any particular aspects of any particular state's CPA. Second, Abbott argues that none of the state CPA claims survive, because they "are irrelevant to their allegations and/or nonactionable," characterizing Plaintiffs' allegations against Abbott as mere "puffery."[22] Dkt. No. 94-1, at 62.

---

[22] The only specific state CPA subclasses discussed in any detail in Abbott's memorandum are set out in section C.3. Those detailed arguments relate to reasons apart from the 9(b) and puffery arguments comprising the majority of this portion of Abbott's brief.

    *1.  Plaintiffs adequately plead CPA claims.*

Abbott seeks to dismiss the CPA claims from 17 states, presumably for failure to plead sufficient allegations under Rule 9(b). Dkt. No. 94-1, at 57 n.15. Those states are Arizona, Arkansas, California, Connecticut, Florida, Georgia, Illinois, Kansas, Maryland, Michigan, Minnesota, Missouri, Ohio, Pennsylvania, Tennessee, Texas, and West Virginia. Specifically, Abbott contends CPA claims generally require the plaintiff to satisfy the specificity required by FRCP 9(b)—as Abbott puts it, the "what" "when" "where" and "how" the fraud, misrepresentation, or omission played out. Dkt. No. 94-1, at 56. This is certainly true of consumer actions brought under the Illinois Consumer Fraud Act. *Pirelli v. Armstrong Tire Corp Retiree Medical Benefits Trust v. Walgreen*, 631 F.3d 436, 446 (7th Cir. 2011); *In re: 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 275 F. Supp. 3d 910, 921 (N.D. Ill. 2017); *Womick v. Kroger Co*, 2022 WL 673095, at *3-4 (S.D. Ill. 2022).

However, as Judge Feinerman noted, the standard is capable of flexibility stating: "That said, the 'requisite information' needed to satisfy the Rule 'may vary on the facts of a given case,' and a 'plaintiff who provides a general outline of [a] fraud scheme sufficient to reasonably notify the defendants of their purported role in the fraud' will comply with Rule 9(b)." *In re: 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 348 F. Supp. 3d 803, 807 (N.D. Ill. 2018), *rev'd in part on other grounds sub nom Bell v. Publix Super Markets*, 982 F.3d 868 (7th Cir. 2020) (internal citations omitted). Moreover, courts repeatedly note that "where the relevant facts 'are peculiarly within the opposing party's knowledge,' and the plaintiff has no access to those facts, courts will not require unflagging adherence to Rule 9(b)'s particularity requirement." *Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164, 172 (W.D.N.Y. 2014) (citing *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008)). Plaintiffs' Amended Complaint is replete with specific

allegations of various misrepresentations by Defendant. *See supra* pp. 2-8. According to the Fifth Circuit, "[d]epending on the claim, a plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' without including all the details of any single court-articulated standard—it depends on the elements of the claim at hand." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188 (5th Cir. 2009). In short, facts that place the defendant on notice of the fraud are sufficient to evade a motion to dismiss.

This standard was applied in *Womick v. Kroger Co.*, 21-cv-00574, 2022 WL 673095, at *4 (S.D. Ill. Mar. 7, 2022). In *Womick*, the class sought monetary damages for Kroger's misrepresentation of the number of cups its various canisters could brew for its brand of ground coffee. The court denied Kroger's motion stating:

> Here, the complaint alleges the labels are deceptive because a reasonable consumer, like Womick, expects that if the product's own brewing instructions are followed, the canisters will make roughly the number of cups of coffee prominently displayed on the packaging. As alleged in the tables above, however, Womick claims that is not the case. . . . Womick satisfies both the reasonable consumer standard and Rule 9(b) here by alleging the "who": Kroger; the "what": the number of cups the canisters represent they can make, which he alleges cannot be made following Defendant's directions; the "when": his purchases in 2020-2021 from Kroger in Carbondale, Illinois, prior to which he read the label; the "where": on the label of the canisters; and the "how": by representing that the products can make a certain number of cups that they are incapable of making, which caused Womick to overpay.[23]

---

[23] The Northern District of California employed a similar approach in *McDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1096-97 (N.D. Cal. 2014). Specifically, the Court denied Ford's motion concluding:

> Plaintiffs adequately allege the "who what when and how," given the inherent limitations of an omission claim. In short, the "who" is Ford, the "what" is its knowledge of a defect, the "when" is prior to the sale of Class Vehicles, and the "where" is the various channels of information through which Ford sold Class Vehicles. In the aggregate, Plaintiffs have pled sufficient facts to survive a motion to dismiss their CLRA claim. Accordingly, Ford's motion to dismiss the CLRA claim will be denied.

*Id.* (internal citations omitted). In other words, Judge Rosenstengel adopted a "flexible" approach concluding where the complaint articulates the framework for the alleged misrepresentation, that is sufficient to plead a CPA claim.

Additionally, in *Click v. Gen. Motors LLC*, the court held that plaintiff's allegations reached the heightened pleading requirements of Rule 9(b). No. 2:18-CV-455, 2020 WL 3118577, at *6 (S.D. Tex. Mar. 27, 2020). Of the "who" requirement, the court noted that "[a]t the 12(b)(6) stage, Plaintiffs do not need to specifically allege who at GM knew of the defect, the source of that knowledge, or any actions taken by GM to conceal the facts." *Id.* (citing *See Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) ("[W]hen discoverable information is in the control and possession of a defendant, it is not necessarily the plaintiff's responsibility to provide that information in her complaint.")). The court also noted that plaintiffs "allege that they saw GM's advertisements in the weeks and months prior to their purchases, satisfying the "when" of Rule 9(b)." *Id.* Further, the court stated that "[a]lthough Plaintiff's Complaint alleges only in general terms that the advertisements induced Plaintiff to purchase the [vehicle], Plaintiff's knowledge and state of mind are not subject to Rule 9(b) [and] . . . premature at the pleading stage." *Id.*; *see* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally.").[24] In other words, in a case—like this—where the plaintiff sets forth the framework for a CPA claim—as Plaintiffs did here—the complaint satisfies Rule 9(b)'s requirements.

---

[24] *See also True v. Am. Honda Motor Co.*, 520 F. Supp. 2d 1175, 1183 (C.D. Cal. 2007) (denying motion to dismiss, stating: "Plaintiff alleges that between March 1, 2003, and March 1, 2007 (when), Defendant advertised the HCH in print and on the Internet (how) to consumers (who) throughout the United States (where) with statements of its fuel efficiency and the prospective cost savings to the consumer that were up to 53 percent below actual figures, while omitting or softening the "[a]ctual mileage will vary" disclaimer (what).").

39

Here, the AC readily establishes the CPA threshold set forth in *Womick*, *Click*, and *McDonald*. For example, the AC pleads the following:

*Who:* Abbott (*see* AC ¶¶ 42-43);

*What:* Intentionally withheld information from the consumers, doctors and regulators—for years—that its products were not only capable of adulteration due to the unsanitary conditions at AN-Sturgis, but were (repeatedly) adulterated throughout the Class Period (*id.* ¶¶ 51, 77);

*When:* According to FDA Form 483 from as early as 2019 until the ultimate "voluntary recall" and plant closure in February 2022 Abbott operated AN-Sturgis in a manner that created the risk of bacterial contamination to its products (*id.* ¶¶ 62-77, 92-106);

*Where:* On Abbott's packaging labels, marketing and promotional materials and internet sites where it repeatedly asserted that its infant formula was safe and effective for its intended use (*id.* ¶¶ 49, 50, 53-56); and

*How:* By representing that its formula products were safe for their intended use when they were not. For example, as far back as 2018 FDA conclude that Abbott's AN-Sturgis facility increased the risk of bacterial contamination to finished products**.** AC ¶¶ 65, 68, 95. FDA further found actual examples of bacterial contamination and that Abbott routinely failed to conduct appropriate testing and inspection prior to distribution. Form 483 at 1-2. Yet, while all this was happening, Abbott told US consumer, "As a leader in nutrition science, research and development, our goal is to deliver nutrition products and education that meet the changing needs of families across the world"—the clear implication being its products are safe.[25] AC ¶¶ 55, 58, 60.

These facts are analogous to those in *Womick*, *Click*, and *McDonald* that when taken "in the aggregate" establish a plausible claim Defendant misrepresented that its products were safe. As such, the allegations are capable of satisfying the pleading standard under most states' CPAs.

       2.    *Abbott's case law supporting its heightened Rule 9 standard is unavailing.*

Nor is Abbott's case law particularly compelling. For example, some of the cases cited do not involve claims made under state CPAs. *See generally*, *Lachmund v. ADM Investment Services, Inc.*, 191 F.3d 777 (7th Cir. 1999) (RICO claim); *Fearrington v. Boston Science*, 410 F. Supp. 794 (S.D. Tex. 2019) (no CPA allegation); *Xia Bi v. McAuliffe*, 927 F.3d 177 (4th Cir. 2019) (same).

---

[25] https://nutrition.abbott/in/about-us (last visited March 24, 2023).

The cases set out in the footnote fair no better. Although all of them stand for the general proposition that allegations of misrepresentation or omission in the marketing of consumer products must adhere to the standards of Rule 9(b), none of them offer the analysis necessary to show that the particular jurisdiction interprets Rule 9(b) with the rigor that Abbott alleges.[26] A shotgun footnote cannot constitute a substitute for analysis. Nothing in Abbott's memorandum informs the Court whether the remaining sixteen states do not follow the approach set forth in *Wolmick*, *Click*, and *McDonald*. As such, its motion should be denied.

3. *Abbott's "Puffery" defense lacks merit, given the facts underlying the "puffery" emanate from FDA's Form 483 and DOJ's subsequent criminal investigation of Abbott's conduct at AN-Sturgis.*

Finally, Abbott also argues that all of the CPA claims should be dismissed because the statements amount to "puffery." Although Abbott cites two cases involving infant foods where the cases were dismissed as mere puffery, *Bland v. Abbott Labs*, 2012 WL 32677 (W.D. Ky. 2012) and *Tylka v. Gerber Foods*, 1999 WL 495126 (N.D. Ill. 1999), its other two cases reveal its approach to be incorrect. Specifically, in *In re Seagate Tech LLC Litig*, 233 F. Supp. 3d 776 (N.D. Cal. 2017), the court found numerous examples of puffery amid plaintiff's allegations, but nonetheless allowed plaintiffs to proceed with California CPA claims. Similarly, in *Brown v. Abbott Labs*, No. 10 C 6674, 2011 WL 4496154 (N.D. Ill. Sep. 27, 2011), the court found that all but one of plaintiff's allegations were mere puffery, but plaintiff's allegation that Abbott

---

[26] For instance, no class allegations are set forth in *Silving v. Wells Fargo Bank*, 800 F. Supp. 2d 1055 (D. Ariz. 2011), *Hampson v. Am. Mktg. Rsch. Inc.*, 2011 WL 13318764 (N.D. Ga. 2011), or *Carter v. Morgan Stanley*, 2017 WL 1382318 (D. Md. 2017). Cases are cited from Bankruptcy Court, *In re McConnell*, 390 BR 170 (Bank W.D. Pa. 2008), and from courts outside the state whose law is being espoused, *Coy's Honey Farm Inc. v. Bayer Corp*, 2022 WL 179210 (W.D. Mo. 2022) (Arkansas law), *Kraft v. Essentia Health*, 2022 WL 1719667 (D. N.D. 2022) (Minnesota law), *Pirelli*, *supra*, (Tennessee law).

represented its formula as being "soothing" when in fact it caused gastrointestinal discomfort in the infant, was sufficient to proceed.

That said, Abbott's motion misses the mark. The simple fact is that the AC details a years-long scheme to withhold critical safety information from consumers, doctors and regulators. These allegations included *FDA's findings that*: 1) it operated without adequate system control to ensure its products did not become adulterated (Form 483 at 1); 2) AN-Sturgis had *Cronobacter* tests between 2019 and 2022 (*id.* at 2, 5); 3) surfaces and work spaces were not maintained or kept clean (*id.* at 4); and 4) Abbott employees failed to maintain industry standards of cleanliness while working with raw materials (Form 483 at 7). These are not "puffery"—they are actual facts, withheld from consumers and the government—that formed the basis for a criminal investigation by DOJ. Abbott's contention to the contrary is simply absurd. Beyond that, one simple fact remains: *none* of these facts were shared with Plaintiffs while Abbott simultaneously told them its products were safe. That is the hallmark of a CPA claim.

### C.   Abbott's Miscellaneous Notice Defense Related to California's CLRA Claim Lacks Merit.

#### 1.   Plaintiffs complied with the CLRA's "notice requirement."

Abbott also seeks to dismiss the California[27] consumer protection claims on a separate technical basis. Specifically, it claims Plaintiffs failed to comply with the CLRA notice requirement. The purpose of the CLRA notice requirement is to allow a defendant 30 days to correct or agree to correct an alleged CLRA violation to prevent liability for damages under the CLRA. Cal. Civ. Code §1782(a); *see also Morgan v. AT&T Wireless Servs., Inc*., 177 Cal. App. 4th 1235, 1259, 99 Cal. Rptr. 3d 768, 788 (2009). Notification is not required prior to filing a

---

[27] Plaintiffs are no longer pursuing a claim under the Georgia Unfair and Deceptive Trade Practices Act or the Michigan Consumer Protection Act.

Case: 1:22-cv-04148 Document #: 97 Filed: 03/24/23 Page 54 of 65 PageID #:1820

complaint seeking injunctive or other equitable relief under the CLRA. Cal. Civ. Code §1782(d). If the defendant does not rectify the CLRA violations after 30 days, the plaintiff can amend his complaint to seek damages, in addition to the injunctive and other equitable relief. *Id.*

Plaintiffs Andaluz and Lyons followed these procedures precisely. Andaluz's original and first amended complaints sought injunctive relief; Lyon's complaint sought injunctive and equitable relief (i.e., an order enjoining the wrongful acts, restitution and disgorgement).[28] Prior to filing the consolidated amended complaint, Plaintiffs notified Defendant by certified mail of the CLRA violations, requested that they be rectified and informed Defendant that the complaint would be amended to seek damages under the CLRA if Defendant did not agree to rectify the problems after 30 days. When Defendant failed to rectify or agree to rectify the problems after 30 days, Plaintiffs added a claim for CLRA damages in the Consolidated Amended Complaint. AC ¶ 215.

Defendant incorrectly argues that Plaintiffs sought damages in their initial complaints. However, as discussed above (and demonstrated in footnote below *see infra* fn. ), this is untrue. Additionally, to the extent that Defendant implies that the CLRA notice requirement also applies to restitution and disgorgement because those are claims for damages, Defendant is wrong. Numerous courts have held that "[p]refiling notice is not required for a CLRA claim for

---

[28] *See Andaluz*, Case No. 22-cv-02001 (C.D. Cal. Mar. 25, 2022), Complaint (Dkt.No. 1) at ¶¶ 127-128 ("Pursuant to California Civil Code §1780(a) of the Act, Plaintiff seeks injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of Defendants including, but not limited to, an order enjoining Defendants from distributing such false advertising and misrepresentations. Plaintiff shall be irreparably harmed if such an order is not granted. . . . Plaintiff reserves the right to amend this complaint to include a request for damages under the CLRA after complying with California *Civil Code* §1782(a) within thirty days after the commencement of this action."); FAC (Dkt.No. 30) at ¶¶ 153-154 (same); *Lyons*, Case No. 22-cv-01125 (N.D. Ill., Mar. 3, 2022) Complaint (Dkt.No. 1) ¶¶ 95-96 (seeking out of restitution of out of pocket losses).

restitution." *Util. Consumers' Action Network v. Sprint Solutions, Inc.*, No. C07-CV-2231-W RJB, 2008 WL 1946859, at *7 (S.D. Cal. Apr. 25, 2008).[29] Moreover, even if pre-suit notice was required for restitution and disgorgement (which it is not), the argument still fails because Plaintiff Andaluz gave notice more than 30 days prior to seeking restitution (or damages). *See Andaluz*, Case No. 22-cv-02001 (C.D. Cal. Mar. 25, 2022), Complaint (Dkt.No. 1) at ¶¶ 127-128, FAC (Dkt.No. 30) ¶¶ 153-154). In short, Plaintiff Andaluz sufficiently complied with the CLRA's notice requirement.[30] Because Plaintiffs supplied adequate notice, Defendant's argument fails.

> 2. *The Consolidated Complaint is an administrative summary of the claims and by stipulation of the Parties, Plaintiff Andaluz's CLRA affidavit must and will be attached to his forthcoming complaint to be filed in this Court.*

The "Consolidated Complaint is an administrative summary of the claims and of the class claims brought by all Plaintiffs with complaints filed and transferred to this multidistrict proceeding by class members who allege to have suffered economic harm by purchasing the

---

[29] *See also In re Mattel, Inc.*, 588 F. Supp 2d 1111, 1119-20 (C.D. Cal. 2008) (refusing to strike plaintiff's CLRA damages claims, where the plaintiff alleged restitution and disgorgement in the original complaint because restitution and disgorgement "do not appear to be 'damages' for the purposes of the CLRA"); *Rosales v. FitFlop*, 882 F. Supp. 2d 1168, 1177 (S.D. Cal. 2012) (holding that plaintiff satisfied CLRA notice requirements where the first complaint sought "injunctive relief, restitution, and disgorgement, but not monetary damages."); *Henderson v. Gruma Corp.*, No. CV 10-04173 AHM (AJWx), 2011 WL 1362188, at *9 (C.D. Cal. April 11, 2011) (affirming that restitution and disgorgement are not considered damages under the CLRA).

[30] *See generally Cuevas v. United Brands Co., Inc.*, 11CV991 BTM RBB, 2012 WL 760403, at *4 (S.D. Cal. Mar. 8, 2012) (finding plaintiff adequately complied with CLRA notice requirement by giving notice after filing initial complaint, but more than 30 days before filing FAC); *Waller v. Hewlett-Packard Co.*, 2011WL 6325972, at *5 (S.D. Cal. Dec. 16, 2011) (finding CLRA notice requirement satisfied "when a plaintiff originally seeks only injunctive relief under § 1750, for which no notice is required, and later sends a notice letter and amends his complaint to seek damages under the statute"); *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1260 (2009) (noting that the plaintiffs "were not required to provide notice before filing the original or first amended complaints because they did not seek damages under the CLRA in those complaints"); *Corra v. Energizer Holdings, Inc.*, 962 F. Supp. 2d 1207, 1221 (E.D. Cal. 2013) (rejecting argument that "if the [notice] requirement is not met before suit is commenced, the complaint cannot subsequently be amended to request CLRA damages").

products as more fully described herein, and is not intended as the operative pleading for purposes of judgment and appeal." AC ¶ 2; *see also id.* ¶¶ 1-3. Thus, in this case, the CLRA's affidavit requirement does not apply to the consolidated complaint but to the pleadings underlying it. Yet, here, the Parties have stipulated to the dismissal of the *Andaluz* complaint in the Central District of California and the refiling of that action in this Court. *See* Dkt. Nos. 92, 92-1 (joint stipulation and proposed order regarding voluntary dismissal of certain class action plaintiffs and claims). The Parties' stipulation remains pending before this Court. Upon order granting the Parties' joint stipulation, Andaluz will file his complaint in this Court, along with the required CLRA declaration.

### D. Plaintiffs' Properly Pled their Claims for Unjust Enrichment.

#### 1. Rule 8 Permits Alternative Pleading.

Abbott seeks to dismiss Plaintiffs' equitable claims contending: 1) there are adequate remedies at law (while simultaneously contending none of Plaintiffs' stated remedies are, in fact, adequate); and 2) Plaintiffs failed to plead the lack of an adequate remedy. It is black letter law that a plaintiff may plead equitable theories in the alternative. Abbott is wrong that Plaintiffs must plead the basis for the lack of an alternative remedy. These arguments are contrary to the law in Illinois and California.[31]

First, at the pleading stage, plaintiffs are allowed to assert claims in the alternative. *See* Fed. R. Civ. P. 8(d)(2), (3); *Barnes v. Unilever United States Inc.*, No. 21 C 6191, 2022 WL

---

[31] Evidencing the deficiency in its motion, Abbott limits its attack to Illinois and California law. However, the AC asserted unjust enrichment claims on behalf of more than a dozen states. One is left to wonder how Abbott can contend *all* unjust enrichment claims may be dismissed when it limited its argument to only two states. The answer is: Abbott cannot. In short, nothing in Abbott's brief supplies *any* guidance on the vast majority of the states pleading an unjust enrichment claim—a fact underscoring the half-hearted effort it makes to dismiss these claims.

2915629, at *2 (N.D. Ill. July 24, 2022) (permitting unjust enrichment claim to proceed in the alternative). "[A] party may plead claims in the alternative," including an unjust enrichment claim. *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. App. Ct. 3d Dist. 2005). However, when the unjust enrichment claim is premised on a failure to fulfill express contractual terms, which is not the case here, the claim fails. *Id.* at 704-05; *see also Oyoque v. DePaul Univ.*, 520 F. Supp. 3d 1058, 1065-66 (N.D. Ill. 2021) (dismissing unjust enrichment claim where an express contract existed). In the absence of an express contract, courts routinely allow unjust enrichment claims to proceed past a Rule 12 motion. *Oyoque*, 520 F. Supp. 3d at 1065-66 (citing cases).

The Central District of California recently observed that it was "aware of no basis in California or federal law" that justifies prohibiting plaintiffs from pursuing equitable claims, including unjust enrichment, "in the alternative to legal remedies at the pleadings stage." *Haas v. Travelex Ins. Servs. Inc.*, 555 F. Supp. 3d 970, 980 (C.D. Cal. 2021) (internal citations and quotations omitted) (collecting cases). "At this stage [in the proceedings], the Court [should decline] to dismiss the unjust enrichment claim as a matter of law, considering [Plaintiffs'] right to plead in the alternative." *Berry v. FCA U.S., LLC*, No. 2:19-CV-00023, 2022 WL 18671067, at *10-11 (S.D. Tex. Mar. 25, 2022) (citing Fed. R. Civ. P. 8(d)) (other citations omitted; *see also Rezac Livestock Comm'n Co. v. Pinnacle Bank*, 255 F. Supp. 3d 1150, 1175 (D. Kan. 2017) ("Rule 8(d) allows a plaintiff to plead unjust enrichment as an alternative to other legal claims."). Accordingly, Plaintiffs "can alternatively plead unjust enrichment since it is *premature at this point* to determine" whether Plaintiffs' other claims "are in fact viable." *Cabrales v. Castle & Cooke Mortgage, LLC*, No. 1:14-cv-01138-MCE-JLT, 2015 WL 3731552, at *3 (E.D. Cal. June 12, 2015) (emphasis supplied); *see also Miller v. Basic Research, Inc.*, No. 2:07-CV-871 TS, 2008 WL 4755787, at *8 (D. Utah Oct. 27, 2008) (emphasis supplied) (denying the defendants' motion

to dismiss the plaintiffs' unjust enrichment claims even though the plaintiffs were "currently pursuing legal claims" against the defendants because, at the time of deciding a Rule 12(b)(6) motion, "the question of whether [the plaintiffs'] legal claims will be fruitless *is not yet determined*."). Indeed, the potential availability of relief under Plaintiffs' other causes of action "does not require dismissal of [their] unjust enrichment claim" on a motion to dismiss. *Harris v. Nordyne, LLC*, No. 14-CIV-21884-BLOOM/Valle, 2014 WL 12516076, at *7 (S.D. Fla. Nov. 14, 2014) (collecting cases).[32]

Thus, even assuming "the alleged conduct that underlies [Plaintiffs' legal claims] appears to be the same conduct that forms the basis for [their] unjust enrichment claim," the Court should "allow Plaintiff's unjust enrichment claim to remain as an alternative claim" at "this stage of the litigation." *Nalley v. Gen. Motors LLC*, No. 1:21-cv-04174-WMR, 2022 WL 18459646, at *9 (N.D. Ga. Aug. 30, 2022) (collecting cases); *see also Wildin v. FCA US LLC*, No. 3:17cv-02594-GPC-MDD, 2018 WL 3032986, at *8 (S.D. Cal. June 19, 2018) (emphasis supplied) (finding that, even if an unjust enrichment claim is *duplicative* of any other of the plaintiff's legal claims, it should not be dismissed at the pleadings stage) (collecting cases).[33] In short, the Court ought to deny Defendant's motion.

---

[32] *See also Hill v. Hoover Co.*, 899 F. Supp. 2d 1259, 1268 (N.D. Fla. 2012) ("[T]he existence of an adequate legal remedy does not preclude the Plaintiff from pleading unjust enrichment in the alternative."); *Linde v. Envision Healthcare Corp.*, No. 2:20-cv-02661-HLT-TJJ, 2021 WL 3089214, at *3 (D. Kan. July 22, 2021) ("It therefore would be premature to dismiss" the plaintiff's unjust enrichment claim "as duplicative" at the motion to dismiss stage.").

[33] California reaches the same conclusion as Illinois law does. As such, Defendant's argument regarding California statutory claims under the UCL, FAL, and CLRA (MTD p. 49) should be rejected, and these claims should be allowed to proceed beyond Defendant's Motion. *See, e.g.*, *Eason v. Roman Cath. Bishop of San Diego*, 414 F. Supp. 3d 1276, 1282 (S.D. Cal. 2019) ("No controlling authority prevents a plaintiff from pleading alternative legal remedies . . .[,] [therefore] Defendants' motion to dismiss Plaintiff's UCL claim for failure to show Plaintiff lacks an adequate remedy at law is denied."); *see also*, *Freeman v. Indochino Apparel, Inc.*, 443 F. Supp. 3d 1107, 1114 (N.D. Cal. 2020) (allowing the plaintiff's UCL and CLRA claims to proceed at the pleading

Second, while Abbott contends Plaintiffs' unjust enrichment claims fail because they allegedly did not specify the basis for the lack of adequate remedy, courts routinely reject this related argument. Specifically, in *Sandee's Catering v. Agri Stats, Inc.*, No. 20 C 2295, 2021 WL 963812, at *7 (N.D. Ill. Mar. 15, 2021) the Court evaluated this same argument. Ultimately, the Court rejected the defendant's motion holding "[t]he Court need not analyze each state's laws. Other courts that have confronted this identical argument have refused to dismiss on these grounds at the pleading stage, finding that Rule 8(d)(2)'s permissiveness allows for pleading in the alternative." *Id.* (citations omitted). Simply put, Rule 8 allows alternative pleading which entitles a plaintiff to pursue unjust enrichment in the absence of an express contract.[34]

2.   *California and Illinois recognize unjust enrichment as a cause of action.*

Abbott's argument that California does not recognize unjust enrichment as a standalone cause of action was foreclosed by *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753 (9th Cir. 2015).[35] Similarly, Illinois law allows plaintiffs to pursue an unjust enrichment cause of action. *See e.g.*, *HPI Health Care Services, Inc.*, 545 N.E.2d at 679 (recognizing unjust enrichment as a

---

stage); *Gamez v. Summit Naturals, Inc.*, 2022 WL 17886027, at *9 (C.D. Cal. Oct. 24, 2022) (holding that adequately pleaded claims under the FAL and UCL can survive a Rule 12(c) ["functionally identical" to a Rule 12(b)(6)] motion to dismiss).

[34] Nor is Defendant's citation to *PDF Print Commc'ns Inc.* helpful in that Plaintiffs in that action were seeking injunctive relief under the UCL which Plaintiffs here are not seeking. *PDF Print Commc'ns Inc. v. Federated Mut. Ins. Co.*, No. CV219896MWFAGRX, 2022 WL 2189631, at *4 (C.D. Cal. Mar. 29, 2022). *Sharma* suffers the same flaw. *Sharma v. Volkswagen AG*, 524 F. Supp. 3d 891, 908-09 (N.D. Cal. 2021). *Buonasera* is not controlling law as it involves an analysis of whether unjust enrichment is available under New York law, which is not a state law at issue in this matter. *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 567 (S.D.N.Y. 2016).

[35] *See also In re Toyota RAV4 Hybrid Fuel Tank Litigation*, 534 F. Supp. 3d 1067, 1120 (N.D. Cal. 2021); *Bruton v. Gerber Products Co.*, 703 F. App'x 468, 470 (9th Cir. 2017) (citing *Hartford Casualty Ins. Co. v. J.R. Marketing, L.L.C.*, 353 P.3d 319 (Cal. Sup. Ct. 2015)); *Deutsch v. Cook*, 2020 WL 977894, at *4 (E.D. Cal. Feb. 28, 2020) ("[T]he court rejects defendant's argument that unjust enrichment is not a viable claim as a matter of law" in California).

cause of action in Illinois).[36] Of course, Abbott provides no additional guidance regarding the other dozen-plus states where Plaintiffs seek unjust enrichment. It is axiomatic that the failure to address an argument in a motion to dismiss results in waiver. In short, Abbott waived this argument (because it never made it) for every other state. Beyond that, the unjust enrichment claims of Plaintiffs (and proposed classes) from California and Illinois should be permitted to proceed.

> 3. *Plaintiffs' unjust enrichment claims are properly pled and should not be dismissed at this early stage of litigation; Plaintiffs conferred a direct benefit on Abbott through the purchase of its products.*

In general, "[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672, 679 (Ill. 1989); *see also In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1015 (C.D. Cal. 2015) (same); *Feiner v. Innovation Ventures LLC*, No. 12–62495–CIV, 2013 WL 2386656, at *5 (S.D. Fla. May 30, 2013) (same); *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Here, Plaintiffs readily satisfy this threshold. For example and as set forth in more detail below (*supra* at 46), Plaintiffs alleged that Defendant: (1) received monies paid by Plaintiffs (and the Class) when they purchased Defendant's products in the relevant time periods; (2) while actively engaged in unlawful business practices, knowingly received and retained the benefit of Plaintiffs' (and the Class's) payments for formula; and (3) retained the benefits it received is unjust and inequitable

---

[36] *National Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 34 N.E.3d 1023, 1043 (Ill. App. Ct. 1st Dist. 2015) (same); *Fortech, L.L.C. v. R.W. Dunteman Co.*, 852 N.E.2d 451, 462 (Ill. App. Ct. 1st Dist. 2006) (collecting cases) (same); *Association Benefit Services, Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 854 (7th Cir. 2007) (treating unjust enrichment as a standalone claim under Illinois law).

49

because it failed to protect harmful product contamination, and concealed known contamination risks at AN-Sturgis. AC ¶¶ 414-424. These allegations are sufficient to state a claim.

Next, Abbott claims that the unjust enrichment claims for eight states should be dismissed because Plaintiffs do not allege they conferred a direct benefit on Abbott. Abbot is wrong. Specifically, courts throughout the country recognize that in the modern economy, consumers do not purchase directly from any manufacturer, therefore a showing of any benefit to the defendant is sufficient to state a claim for unjust enrichment. *See In re Takata Airbag Prod. Liab. Litig.*, No. 15-2599-MD-MORENO, 2017 WL 2406711, at *9 (S.D. Fla. June 1, 2017) (quoting *Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4901346, at *5 (S.D. Fla. Oct. 14, 2011) ("It would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the 'benefit' passed through an intermediary before being conferred on a defendant")); *Romano v. Motorola, Inc.*, No. 07-CIV-60517, 2007 WL 4199781, at *2 (S.D. Fla. Nov. 26, 2007) ("Defendant erroneously equates direct contact with direct benefit in arguing that because plaintiff here did not purchase either his phone or his batteries from Motorola, plaintiff conferred no direct benefit on Motorola"). As noted by the Southern District of Georgia:

> Electrolux first argues that Plaintiffs have not conferred a direct benefit on Electrolux. Electrolux has not cited a Georgia authority restricting unjust enrichment claims to direct benefits, and the Court has not found any through its own research. Additionally, each Plaintiff's purchase of an Electrolux product confers a marginal benefit on Electrolux—both in the economic and colloquial sense of the term. That benefit may be small, but it is a benefit nonetheless.

*Terrill v. Electrolux Home Products, Inc.*, 753 F. Supp. 2d 1272, 1290 (S.D. Ga. 2010); *see Zeigler v. Sony Corp. of America*, 849 A.2d 19, 25 (Conn. Super. Ct. 2004) (stating "clearly the purchase of DVD players conferred a benefit upon the defendants" and noting that "recovery under an unjust enrichment claim is fact driven"). Plainly stated, in a modern economy, the purchase of the

defendant's product, coupled with the attenuated revenue the defendant receives, is sufficient to establish the defendant received a "benefit."

Here, Plaintiffs purchased Abbott's products from retailers who transact with Abbott. As such, Abbott received a benefit every time Plaintiffs purchased its product—a fact supported by the obvious observation that it continues to sell formula to this day. *See In re Takata Airbag Products Liab. Litig.*, 462 F. Supp. 3d 1304, 1328 (S.D. Fla. 2020) (direct benefit not required under Connecticut, Florida, Michigan, Ohio, and Pennsylvania law to state a claim for unjust enrichment where plaintiffs purchased from authorized dealers); *In re Takata Airbag Products Liab. Litig.*, No. 15-2599-MD-MORENO, 2017 WL 775811, at *7 (S.D. Fla. Feb. 27, 2017) (no direct benefit required under South Carolina law where purchase was made from authorized dealer). Plaintiffs purchased from authorized retailers like Walmart, Target, Costco, and Stop & Shop. AC ¶¶ 18, 20. In turn, Abbott cannot disclaim a benefit from Plaintiffs when Plaintiffs are the end-consumers of Abbott's products. Here, Abbott directs its advertising and marketing to consumers like Plaintiffs so they will buy its products—which actually occurred. AC ¶¶ 47-61. This Court should follow others before it and hold that it does not serve the principles of justice and equity to preclude consumers from recovering under a theory of unjust enrichment because a manufacturer does not sell its contaminated products directly to consumers, but instead relies on intermediaries to turn a profit. As such, the Court ought to deny Abbott's motion.

## CONCLUSION

For the foregoing reasons, the Court should deny Abbott's motion to dismiss as set forth in detail above.

Dated: March 24, 2023   Respectfully submitted,

        */s/ Stacy K. Hauer*
        Stacy Hauer (MN Bar#0317093) (Co-Lead Counsel)
        Timothy J. Becker (MN Bar #0256663)
        Jacob R. Rusch (MN Bar #0391892)
        Zackary S. Kaylor (MN Bar #0400854)
        JOHNSON BECKER, PLLC
        444 Cedar Street, Suite 1800
        Saint Paul, MN 55101
        T: 612-436-1800
        F: 612-436-1801
        tbecker@johnsonbecker.com
        shauer@johnsonbecker.com
        jrusch@johnsonbecker.com
        zkaylor@johnsonbecker.com

        E. Samuel Geisler (FL Bar No. 83817, Ill Bar No. 6305996) (Co-Lead Counsel)
        Caitlyn Prichard Miller (FL Bar No. 126097)
        Sin-Ting Mary Liu (FL Bar No. 84438, CA Bar No. 282884)
        AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
        17 East Main Street, Suite 200
        Pensacola, FL 32502
        T: (850) 202-1010
        F: (850) 916-7449
        mliu@awkolaw.com
        sgeisler@awkolaw.com
        cmiller@awkolaw.com

        Jason J. Thompson (MI Bar No. P47184)
        David R. Parker (MI Bar No. P39024)
        Kevin Stoops (MI Bar No. P64371)
        Kathryn Milz (Ill bar No. 6297213)
        SOMMERS SCHWARTZ, P.C.
        One Towne Square, 17th Floor
        Southfield, Michigan 48076
        T. (248) 355-0300
        jthompson@sommerspc.com
        dparkrer@sommerspc.com
        kstoops@sommerspc.com
        kmilz@sommerspc.com

Kiley L. Grombacher, Esq. (CA Bar No. 245960)
BRADLEY/GROMBACHER, LLP
31365 Oak Crest Dr., Suite 240
Westlake Village, California 91361
T: (805) 270-7100
F: (805) 270-7589
kgrombacher@bradleygrombacher.com

**CERTIFICATE OF SERVICE**

I certify that on March 24, 2023, a copy of the foregoing document was served electronically through the Court's electronic filing system upon all parties appearing on the Court's ECF service list.

Dated: March 24, 2023

*/s/ Stacy K. Hauer*
Stacy K. Hauer

*Counsel for Plaintiffs*