IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: RECALLED ABBOTT INFANT FORMULA PRODUCTS LIABILITY LITIGATION | ) ) ) ) | Case No. 22 C 4148 MDL No. 3037 |
| This document relates to: *Sampsell v. Abbott Laboratories*, No. 23 C 14262 | ) ) ) ) ) | |

CASE MANAGEMENT ORDER NO. 18
(Memorandum Opinion and Order on Motion for Summary
Judgment in *Sampsell v. Abbott Labs.*, No. 23 C 14262)

MATTHEW F. KENNELLY, District Judge:

This multidistrict litigation proceeding involves lawsuits by numerous plaintiffs who allege that they have suffered injuries caused by infant formula manufactured by Abbott Laboratories. The plaintiffs in this case, Stephanie Sampsell, April James, and Brittany Clark, have sued Abbott on behalf of a nationwide class of consumers who purchased any of Abbott's Similac, Alimentum, and EleCare infant formula products from April 1, 2021 to the present. They assert a claim of unjust enrichment based on the payment of increased prices for Abbott products and additional hardships resulting from a nationwide formula shortage they claim Abbott caused.

Abbott has moved to dismiss the claims under Federal Rule of Civil Procedure 12(b)(1) for lack of standing and Rule 12(b)(6) for failure to state a claim. In the alternative, Abbott also moves to strike the plaintiffs' class allegations pursuant to Rule 12(f). For the reasons below, the Court denies Abbott's Rule 12(b)(1) motion but grants its Rule 12(b)(6) motion.

## Background

Abbott Laboratories is a leading producer of infant formula in the United States. It operates multiple facilities, which together produce 40 percent of the nation's powdered infant formula. One of Abbott's largest facilities is located in Sturgis, Michigan. "The Sturgis facility alone is responsible for 40% of the company's domestic formula production." Compl. ¶ 8.

The plaintiffs assert that the Sturgis facility has an extensive history of quality control failures, as well as unsafe and unsanitary manufacturing practices that were not properly addressed and that led to a shutdown of the facility in February 2022. They note that Abbott was aware of a whistleblower complaint to the U.S. Department of Labor's Occupational Safety and Health Administration regarding bacterial contamination at the Sturgis facility as early as February 2021. In September 2021, the Food and Drug Administration issued an Establishment Inspection Report based on its inspection of the Sturgis facility. The report stated that Abbott received at least sixteen complaints regarding infants contracting Salmonella or Cronobacter in relation to its powdered formula products from 2019 through 2021. The report also found Cronobacter in two batches of powdered formula and five different environmental samples.

After issuing the inspection report, the FDA received several additional reports of illness in infants caused by the formula, and it found several positive Cronobacter results from environmental samples while inspecting the Sturgis facility from September 2021 through January 2022. On February 17, 2022, the FDA and the Centers for Disease Control and Prevention warned consumers not to use or purchase certain

Abbott powdered infant formulas and announced an investigation into complaints related to formula products manufactured at the Sturgis facility.

On the same day the FDA and CDC issued the consumer advisory and announced the investigation, Abbott began a voluntary recall of its products and ceased production of powdered infant formula at the Sturgis facility.

The plaintiffs contend that shutdown of the Sturgis facility was "avoidable" and "spurred a nation-wide formula shortage." Compl. ¶ 9. Following the recall and shutdown of the Sturgis facility, the plaintiffs allege, formula "[o]ut-of-stock rates spiked to 74% nationally by the end of May 2022," *id.* ¶ 79, and by June "ten states had out-of-stock rates at 90% or greater." *Id.* ¶ 83. Because infant formula is an essential product that often cannot be replaced or diluted without significant health risks, "parents and caregivers had no option other than to spend extra time and resources to locate infant formula, and to submit to paying higher prices—including paying even higher prices for Defendant's typically higher-priced products, during the Shortage." *Id.* ¶ 93.

From March 2021 through May 2022, "formula prices increased by an average of 11 percent," and "the [formula] industry's profit margin increased by 2.6 percentage points." *Id.* ¶ 11 (quoting Laura Stilwell & Lisa Gennetian, *How the Baby Formula Shortage Financially Strains U.S. Families*, PBS Newshour (Oct. 8, 2022, 9:08 AM), https://www.pbs.org/newshour/economy/how-the-baby-formula-shortage-financially-strains-u-s-families (last visited Apr. 10, 2024).

The plaintiffs all purchased Abbott products from retail stores during the formula shortage. They allege the shortage caused them to spend extra time searching for available formula and experience purchasing limitations and that they were "forced to

3

pay more than [they] would have otherwise paid for infant formula" but for the contamination and shutdown of the Sturgis facility. Compl. ¶¶ 18-20. In support of their claim for unjust enrichment, the plaintiffs allege that Abbott "received and is receiving benefits in the form of monies paid by Plaintiffs (and members of the proposed classes) when they purchased and continue to purchase Defendant's products at premium prices—and at even higher prices amidst the Shortage." *Id.* ¶ 121. The plaintiffs contend that Abbott "had ample notice and opportunity to address its systemic dereliction of mandatory safety practices," and that its "noncompliance instigated the Shortage." *Id.* ¶¶ 119-20. They allege that "it is inequitable for Defendant to retain the benefits it received, and is still receiving, without justification, as a result of the increased formula prices that resulted from Defendant's inability to comply with its lawful obligations." *Id.* ¶ 126.

## Discussion

Abbott moves to dismiss the plaintiffs' unjust enrichment claim for lack of standing under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). Article III standing is a necessary component of federal subject matter jurisdiction. The Court accordingly addresses it first. *See Kithongo v. Garland*, 33 F.4th 451, 454 (7th Cir. 2022) ("The 'first and fundamental question' our court must answer 'is that of jurisdiction.'" (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998))).

### A.    Rule 12(b)(1) – subject matter jurisdiction

The Constitution limits federal courts to the adjudication of "cases" and "controversies," which requires a plaintiff to meet the "irreducible constitutional minimum" of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992). To

4

establish Article III standing, a plaintiff must show it suffered (1) a concrete injury in fact that (2) was likely caused by the defendant, and (3) is likely to be redressed by a favorable decision. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

"In evaluating a challenge to subject matter jurisdiction, the court must first determine whether a factual or facial challenge has been raised." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). "A facial challenge attacks standing on the pleadings, arguing that the plaintiff lacks standing even if the well-pleaded allegations in the complaint are taken as true. A factual challenge, by contrast, asserts that there is in fact no standing." *Flynn v. FCA US LLC*, 39 F.4th 946, 952 (7th Cir. 2022) (citation omitted).

Abbott asserts a facial challenge to the plaintiffs' standing, arguing that "they have not identified any harm fairly traceable to Abbott, nor have they suffered the type of concrete, non-speculative injury that Article III requires." Def.'s Mem. at 8. "[W]hen evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court should use *Twombly–Iqbal*'s 'plausibility' requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Silha*, 807 F.3d at 174. Specifically, the plaintiff must allege factual matter sufficient to support the inference that standing exists, and "the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in" their favor. *Id.* at 173. Standing is specific to each claim and form of relief the plaintiffs seek. *TransUnion*, 594 U.S. at 431.

The plaintiffs all allege that they were "forced to pay more than [they] would have otherwise paid for infant formula" but for the contamination and shutdown of the Sturgis facility. Compl. ¶¶ 18-20. Abbott does not argue that the plaintiffs' alleged financial

5

harm is not an injury in fact. *See In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011) ("A financial injury creates standing."). Instead, Abbott claims that the plaintiffs' complaint is vague regarding whether their claims are premised on the purchase of Abbott formula specifically, and that because the plaintiffs bought Abbott products through retailers, their harm is not fairly traceable to, or "likely caused by" Abbott. *TransUnion*, 594 U.S. at 423; *see* Def.'s Mem. at 11. This argument is unpersuasive. The plaintiffs all identify the specific Abbott products they purchased during the shortage and where they purchased the products, and they allege they had to pay more for the products than they otherwise would. Compl. ¶¶ 18-20. The plaintiffs have also alleged facts sufficient to support a plausible inference that Abbott's conduct is the likely cause of the price increase. They allege that the Sturgis facility was responsible for 20 percent of infant formula produced in the United States. *Id.* ¶ 8. They allege a history of quality control issues and FDA investigations at that facility. They allege price increases and out-of-stock rate spikes after the closure of that facility. And they allege profit margin increases of 2.6 percent in the formula industry. *Id.* ¶ 11. The plaintiffs have thus pled facts sufficient to allege they suffered a financial harm traceable to Abbott, which meets their burden under Rule 12(b)(1).[1]

B. **Rule 12(b)(6) – failure to state a claim**

On a motion to dismiss for failure to state a claim, the Court takes the plaintiffs'

---

[1] The other injuries the plaintiffs identify—purchase limitations and time spent looking for formula—are not supported by factual allegations sufficient to confer standing. This is particularly so given that the plaintiffs assert a claim for unjust enrichment, the remedy for which is disgorgement of a benefit claimed to have been unjustly conferred upon the defendant. The plaintiffs have not sufficiently alleged that disgorgement would remedy these harms. *TransUnion*, 594 U.S. at 431 ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek").

factual allegations as true, draws reasonable inferences in the plaintiffs' favor, and assesses whether the plaintiffs have asserted a plausible basis for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). A claim is plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When doing this assessment, a court need not accept unsupported conclusory factual allegations and legal conclusions as true. *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021).

Under the law of the plaintiffs' home states—California, Ohio, and Utah—to state a claim for unjust enrichment, a plaintiff must allege that they conferred a benefit on the defendant which the defendant accepted or retained under circumstances where it would be unjust to do so.[2] *See Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51, 924 P.2d 996, 1003 (1996); *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984); *Jeffs v. Stubbs*, 970 P.2d 1234, 1248 (Utah 1998). Ohio law additionally requires a plaintiff to allege that the purchase claimed to have unjustly enriched the defendant was direct, rather than through a retailer. *See Johnson v. Microsoft Corp.*, 106 Ohio St. 3d 278, 834 N.E.2d 791, 799 (2005); *Marlowe v. Nature's Bounty Co.*, No. 1:17 CV 332, 2017 WL 2291683, at *3 (N.D. Ohio May 25, 2017).

The plaintiffs argue that Abbott's retention is unjust because its own misconduct

---

[2] Under Ohio and Utah law, a claim for unjust enrichment may serve as a stand-alone claim. *See Rawlings v. Rawlings*, 2010 UT 52, 240 P.3d 754; *Aurora Hill, Ltd. v. Bremner*, 2023-Ohio-3766, 226 N.E.3d 555. California courts are "split on this issue." *O'Grady v. Merch. Exch. Prods., Inc.*, 41 Cal. App. 5th 771, 791, 254 Cal. Rptr. 3d 494, 510 (2019).

7

led to the shutdown of the Sturgis facility, the formula shortage, and related price increases. Even accepting the facts as alleged and drawing inferences in the plaintiffs' favor, this contention cannot survive a motion to dismiss. Specifically, even if one assumes that the plaintiffs conferred a benefit on Abbott by paying increased prices for its products during the shortage, they have not plausibly alleged that Abbott's retention of that benefit is unjust under the circumstances.

Underlying the plaintiffs' theory of unjust enrichment is an assumption that Abbott was obligated to maintain particular levels of formula production and supply or otherwise ensure stable formula prices. The plaintiffs have cited no law that supports imposing this sort of a duty on Abbott. Instead, they argue that Abbott assumed this duty through its occupation of a significant share of the formula market and status as a single-supplier contract holder with the United States Special Supplemental Nutrition Program for Women, Infants, and Children (WIC). Compl. ¶¶ 30-35. But the plaintiffs, who do not allege that they are WIC participants in any event, have provided no basis for the Court to conclude that the size of a company's market share gives rise to an obligation to continue producing a product at all, let alone in certain quantities or at certain prices.

Under similar circumstances involving drug shortages in the pharmaceutical industry, courts have declined to impose such a duty. *See, e.g., Lacognata v. Hospira, Inc.*, No. 8:12-cv-822-T-30TGW, 2012 WL 6962884, at *2 (M.D. Fla. July 2, 2012), *aff'd*, 521 F. App'x 866 (11th Cir. 2013) ("There is no authority that supports Plaintiff's argument that a drug manufacturer . . . has a duty to continue supplying a patient with a drug that it knows the patient relies upon for his or her medical health."). Doing so

8

"would prevent a manufacturer from ever ceasing production, require it to predict all potential demand, and further require it to maintain large stockpiles to prevent any shortages in case of production problems." *Schubert v. Genzyme Corp.*, No. 2:12-CV-587-DAK, 2013 WL 4776286, at *7 (D. Utah Sept. 4, 2013). The Court agrees.

The plaintiffs contend this case is different because Abbott "created the danger that led to" the shutdown and shortage, Pls.' Resp. at 7, and as a result had "a duty to protect against harms created by [its] own conduct." *Id.* (quoting *Doe-2 v. McLean County Unit Dist. No. 5 Bd. Of Dirs.*, 593 F.3d 507, 515 (7th Cir. 2010)). But if Abbott had a duty in this regard, it involved stopping the release and distribution of tainted infant formula. This was achieved through the recall and shutdown of the Sturgis facility.

Abbott continued producing its formula products through its other facilities, but it was operating with 40 percent less capacity as a result of the shutdown. *See* Compl. ¶ 8. The plaintiffs received the products they paid for and do not allege they were harmed by those products. Their claim of unjust enrichment is rooted in price increases and allegations that the formula "industry's profit margin increased by 2.6 percentage points." Compl. ¶ 11. But these are industry-wide figures, not specific to Abbott. Perhaps more importantly, even if profit margins increased, it's likely—given the alleged shortfall in supply—that overall sales revenues during the pertinent period were way down and thus that net profits (as opposed to the percentage profit margin) dropped during that period. The plaintiffs' generalized allegations on this point are insufficient to satisfy the "enrichment" component of unjust enrichment, even if the plaintiffs could satisfy the "unjust" component. As discussed earlier, they cannot do so, as they have

9

not plausibly alleged that Abbott was under any obligation to them to continue producing formula, maintain a particular supply level, or keep prices down. *See generally Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 968 (7th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) ("At the pleading stage, the plaintiffs' factual allegations must '[ ] cross the line from conceivable to plausible.'")).

## Conclusion

For the reasons stated above, the Court denies Abbott's motion to dismiss for lack of standing but dismisses the complaint under Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted. Unless the plaintiffs file, by May 3, 2024, a motion for leave to amend that attaches a proposed amended complaint with at least one viable claim over which the Court has jurisdiction, the Court will enter judgment dismissing the *Sampsell* case with prejudice.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 12, 2024