**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: RECALLED ABBOTT INFANT FORMULA PRODUCTS LIABILITY LITIGATION** | ) ) ) ) ) ) | |
| | | Case No. 22 CV 4148 |
| **This Document Relates To:** | ) | MDL No. 3037 |
| | ) ) | |
| **Pelizzaro v. Abbott Laboratories,** | ) | Hon. Judge Matthew F. Kennelly |
| **Case No.: 1:23-cv-04833** | ) ) | |

**PLAINTIFF LEADERSHIP COMMITTEE II'S
MOTION TO COMPEL RULE 30(b)(6) DEPOSITION OF DEFENDANT ABBOTT**

## I.     INTRODUCTION

The parties negotiated a protocol whereby the Plaintiff Steering Committee II ("PSC II") would serve a single, collective Rule 30(b)(6) deposition notice on behalf of the five remaining Plaintiffs –minor infants who suffered severe, permanent injuries after consuming powdered infant formula manufactured by Abbott at its Sturgis, Michigan, factory. *See* Case Management Order No. 23, at §V., B (ECF 302). PSC II served the collective Rule 30(b)(6) deposition notice on Abbott on March 10, 2026. See Exhibit A. On April 6, 2026, Abbott responded to the 17-page deposition notice with 81 pages of objections. See Exhibit B. The parties met and conferred pursuant to Rule 30(b)(6) on several occasions after Abbott served its objections.

PSC II's single, consolidated Rule 30(b)(6) deposition notice necessarily needs to encompass the factual terrain of five distinct and separate cases. PSC II carefully drafted a comprehensive set of specific deposition topics that "describe with reasonable particularity the matters for examination," while remaining tethered to the core issues in this litigation: the powdered infant formula manufactured at Abbott's Sturgis factory. Fed. R. Civ. P. 30(b)(6). Plaintiffs served a Rule 30(b)(6) notice that complied with the Rule's requirement that the noticing party "describe with reasonable particularity the matters for examination." Fed. R. Civ. P. 30(b)(6). PSC II's proposed matters for examination are quintessential subjects for Rule 30(b)(6) examination that go to the heart of what corporate deposition practice is designed to elicit.

The notice identified discrete subject matters concerning Abbott's food safety systems, environmental monitoring, microbiological controls, contamination investigations, and product-release decision-making applicable to powdered infant formula manufactured at the Sturgis facility during the relevant time period. However, Abbott has failed to confer in good faith about PSC II's proposed matters for examination as required by Rule 30(b)(6). The unfortunate reality is that no

matter how PSC II phrases any given matter for examination, Abbott adopts a wildly strained and implausible reading of PSC II's straightforward deposition topics. One of the themes of Abbott's positions during meet and confers was that there was no way it could prepare a witness to testify about many of PSC II's proposed topics; however, this position ignores Abbott's responsibilities under well-established caselaw. "If the deponent is unable to answer questions about certain relevant areas of inquiry then the business entity must designate additional parties to satisfy a Rule 30(b)(6) notice." See *Beloit Liquidating Trust v. Century Indemnity Co.*, No. 02 C 50037, 2003 U.S. Dist. LEXIS 2082, at \*6 (N.D. Ill. Feb. 13, 2003).  PSC II are also cognizant that the Court will set time limits on the Rule 30(b)(6) depositions. PSC II has explained the same to Abbott, but Abbott continues to insist on taking a non-sensical approach to each of PSC II's Rule 30(b)(6) deposition topics, and in many cases objecting entirely to what are proper and narrow matters for examination. Abbott's objections are based on mischaracterized interpretations of PSC II's topics as phrased. Each of PSC II's matters for examination are specific and tailored with reasonable particularity.

Abbott is the entity with actual knowledge or information reasonably available to it as an organization regarding PSC II's proposed matters for examination. A "designated Rule 30(b)(6) witness need not be the "most knowledgeable witness," but rather be competent to testify about information "known or reasonably available to the corporation." *Georgia-Pacific Consumer Products LP v. Kimberly-Clark Corp.*, 749 F. Supp. 2d 787, 802 (N.D. Ill. 2010). To the extent Abbott argues it cannot reasonably be expected to prepare a witness to testify to all the topics Plaintiffs request, such an argument is irrelevant because even if the deponent is unable to answer questions about certain relevant areas of inquiry then the business entity must designate additional

parties to satisfy a Rule 30(b)(6) notice" *See Beloit Liquidating Trust v. Century Indemnity Co.*, No. 02 C 50037, 2003 U.S. Dist. LEXIS 2082 (N.D. Ill. Feb. 13, 2003).

PSC II will suffer undue prejudice if Abbott is permitted to shield itself from testify about properly designated matters for examination. Abbott can easily prepare and produce corporate witnesses to testify about each of PSC II's proposed Rule 30(b)(6) topics as written. PSC II's matters for examination are described with more than sufficient reasonable particularity and are squarely relevant to Plaintiffs' claims and Abbott's affirmative defenses in these cases. Defendant's effort to feign confusion about the scope of topics squarely within its own institutional knowledge is not a good-faith invocation of the Rules; it is obstruction dressed in procedural clothing.

Rule 30(b)(6) places an affirmative obligation on a corporation to identify and prepare witnesses who can testify to the matters described with reasonable particularity in a deposition notice. *See* Fed. R. Civ. P. 30(b)(6). The Rule exists precisely because corporations — unlike individual witnesses — possess diffuse institutional knowledge that must be organized and presented by the entity itself. Abbott cannot escape that obligation by pretending not to understand what is being asked of it.

As set forth below, PSC II's Rule 30(b)(6) matters for examination are proper, precisely stated, and directly relevant to the claims and defenses at issue in this consolidated litigation. Abbott's objections mischaracterize those topics, apply non-standard and illogical interpretations, and should be overruled. PSC II respectfully request that the Court compel Defendant to provide a fully prepared Rule 30(b)(6) witness on all noticed topics, without the artificial limitations Abbott has unilaterally sought to impose.

## II.     30(b)(6) Deposition Topics

**End Date of the Relevant Time Period for Topics 2, 3, 4, 5, 7, 8, 9, 10, and 12-20**

The parties agree to the start date of the relevant time period is January 1, 2019, however the parties disagree as to the end date. Plaintiffs' requests September 2, 2025 while Abbott would impose a March 31, 2022 end to the relevant time period for inquiry.

This Court has already spoken on this issue. Specifically, in ordering production of the Consent Decree File, the Court found "a pretty darn good chance that there's material in there that postdates March the 31st of 2022 that has some bearing on what happened before March the 31st of 2022 . . . that's relevant to the actual injuries that these people suffered." *See* 9/4/2025 Hrg. Tr., at p. 34:2-7. Since receiving production of the Consent Decree File, Plaintiffs can confirm this Court was correct. PSC II is entitled to deposition testimony by Abbott's corporate representatives on the same material the Court has already deemed relevant and ordered produced.

**TOPIC 4: Food Safety and Quality Systems.**

The parties agreed that Abbott "will provide general, non-privileged testimony regarding its HACCP plans so far as they concern prevention of microbiological contamination, the practices it employed to investigate and appropriately address positive or presumptive positive in-process, environmental or finished product tests for Cronobacter, Salmonella, Enterobacter, and SPC during the Relevant Time Period." The remaining dispute is limited to whether Abbott must provide testimony regarding whether those food safety and microbiological control systems changed after the Recall.

Changes to the food safety and microbiological systems after the Recall are directly relevant because they speak to the systems and procedures that were not in place from 2019-2022, when Plaintiffs' formulas were manufactured. This testimony is relevant to the adequacy of Abbott's procedures from 2019-2022 with respect to food safety, quality and contamination-prevention systems. It is also relevant to whether Abbott knew or should have known of

contamination risks, preventive controls, and whether Abbott identified deficiencies or necessary improvements in the systems previously in place. The request as written is reasonably particular and well within the permissible scope of discovery under Rule 30(b)(6).

**TOPIC 5: Microbiological Risk Assessments.**

Abbott objects to the topic entirely and incorporates by reference its response to Topics 4, 6, 7(a), 7(e), 8(a), and 8(c). However, topic 5 is also not duplicative of Topics 4, 6, 7(a), 7(e), 8(a), or 8(c). Those Topics concern more discrete subjects specific to the manufacturing operations, including environmental monitoring, testing requirements and practices, isolate handling, and responses to particular microbiological events. Topic 5, by contrast, seeks testimony regarding Abbott's broader risk-assessment and decision-making process, including what Abbott understood about contamination risks, how Abbott evaluated potential consumer risk following microbiological events, whether Abbott materially revised mitigation measures over time, and whether outside scientific or statistical consultants reviewed or informed those methodologies. Documents alone do not answer these questions.

This testimony is relevant to notice, foreseeability, the adequacy and reasonableness of Abbott's contamination-prevention measures, and Abbott's own food safety and risk-management decision-making. Plaintiffs are not seeking expert opinions through this Topic. Rather, Plaintiffs seek factual testimony regarding what Abbott knows or reasonably knows about the public health risk posed to its own customers and the decision-making processes, methodologies, and assessments as they relate to microbiological contamination risks and consumer safety. The Topic is narrowly tailored to those subjects and falls well within the permissible scope of Rules 26 and 30(b)(6).

**TOPIC 7(f): Microbiological Sampling and Testing.**

Topic 7(f) seeks testimony regarding "Comparisons between AN-Sturgis isolates and clinical isolates, including isolates associated with the FDA recall investigation and any plaintiff-specific isolates." Having affirmatively relied on isolate comparisons and sequencing information to support its defenses, Abbott cannot simultaneously refuse to provide Rule 30(b)(6) testimony regarding those comparisons. Plaintiffs do not seek testimony regarding the CDC's independent scientific conclusions or opinions. Rather, Plaintiffs seek factual corporate testimony regarding Abbott's knowledge, understanding, use, interpretation, and reliance upon comparisons between Sturgis isolates and clinical isolates associated with the FDA investigation and Plaintiffs' cases. That includes testimony regarding the isolate information Abbott reviewed, communications concerning isolate comparisons, Abbott's understanding of the sequencing information, and the bases for the factual assertions Abbott has already advanced in this litigation and the general public. Abbott cannot invoke CDC 'no close relation' conclusions affirmatively while simultaneously blocking inquiry into the underlying comparison work and methodological choices. The Topic is relevant, described with reasonable particularity, and constitutes proper Rule 30(b)(6) discovery.

**TOPIC 8(e) and 8(f): Bacterial Contamination Events.**

Abbott's objection should be overruled. Topic 8(e) seeks plainly relevant testimony concerning campaign information, adjacent lots, campaign batches, root-cause investigations, corrective actions, and product disposition following suspected or actual microbiological-positive events during the relevant period. Those subjects go directly to notice, traceability, contamination spread, the adequacy of Abbott's investigation and response, and whether Abbott released potentially affected product despite contamination signals. Abbott cannot avoid discovery by

asserting its preferred merits narrative—that no plaintiff batch was part of a campaign involving a positive event, and that no positive finished-product batch was ever distributed. Those are disputed factual assertions at the heart of the case, not threshold grounds to block examination under Rule 30(b)(6).

Abbott's vagueness objections are equally unavailing. In context, the terms "campaign information," "adjacent lots," "campaign batches," and "disposition" are ordinary manufacturing and quality-control concepts that Abbott necessarily uses in operating its own production and investigation systems. Rule 30(b)(6) does not require Plaintiffs to draft the topic with evidentiary-level detail or identify every underlying document in advance. It requires reasonable particularity, and this topic easily meets that standard by identifying the precise operational subjects on which testimony is sought.

Abbott likewise cannot satisfy its corporate testimony obligation by pointing to documents or incorporating other objections by reference. A document production is not a substitute for a prepared witness able to explain how Abbott identified affected campaigns, what lots were treated as adjacent or implicated, what testing was performed, what root-cause conclusions were reached, what corrective actions were taken, and how disposition decisions were made. Those are quintessential matters for Rule 30(b)(6) testimony. If Abbott contends the topic sweeps too broadly, the remedy is reasonable narrowing—not a wholesale refusal to produce a witness. Plaintiffs are therefore entitled to an order compelling Abbott to designate and prepare one or more witnesses to testify fully on Topic 8(e).

Abbott's attempt to block Topic 8(f) should be rejected. Plaintiffs do not seek abstract testimony about recall law; they seek the factual and scientific basis for Abbott's decisions not to recall product after positive contamination signals at AN-Sturgis. That testimony bears directly on

notice, risk assessment, the adequacy of Abbott's response, and the reasonableness of its conduct. A manufacturer cannot shield from discovery its internal basis for declining to recall product in the face of microbiological detections by recasting the issue as an irrelevant "regulatory compliance" inquiry. Nor does the topic call for a legal conclusion. It seeks factual testimony regarding what Abbott knew, what information it considered, what criteria it applied, and why it chose not to recall. Those are proper and discoverable Rule 30(b)(6) subjects.

**TOPIC 9(a): Inspections, Audits and Regulatory Actions.**

The EIRs and 483s issued by the FDA go to the heart of the failures of Abbott to manufacture unadulterated powered infant formula. By identifying ten (10) specific documents, Plaintiffs placed discernible limits on this area of inquiry that are uniquely tied to the actual claims and defenses at issue here. The documents identified in this area of inquiry are well known to Abbott and very limited scope of documents for discussion make this area adequately particularized when read in the context of this litigation. Finally, the *Consent Decree of Permanent Injunction* was agreed to by Abbott, and signed off on by not only Abbott, but by the law firm that represents Abbott in this action. Abbott surely can't profess an inability to prepare a witness to answer questions about the *Consent Decree of Permanent Injunction.*

**TOPIC 10: Sales, Marketing and Distribution.**

Abbott has objected to four of the five sub-topics in full and offered only narrow testimony on sub-topic (b). The objections are misplaced. This is a products liability case in which Plaintiffs have alleged fraud, misrepresentation, and failure to warn — claims that turn directly on what Abbott told consumers, healthcare providers, and the institutions through which Plaintiffs received Abbott's products.

The Court has already addressed the relevance of Abbott's sales and marketing practices to the claims at issue. At the January 15, 2026 discovery hearing, the Court explained "What they're trying to find out is what exactly it was that Abbott's sales reps told people at the hospital, which presumably is geared towards having the hospital get Abbott's product in front of patients or the parents of infants to get them to buy it… There is a Count 5…entitled Fraud…Abbott markets to the people who do deal with the patients. What they're trying to find out is what did the marketing say. The reason they're trying to find out is because it has a bearing potentially on their fraud claim." 1.15.2026 Hrg. Tr. 63:12–64:9. See Exhibit C.

That reasoning squarely applies to sub-topics (a), (b), and (d), each of which concerns what Abbott said — to hospitals, healthcare professionals, consumers, and within its own brand and marketing strategy — about its powdered infant formula. At least one Plaintiff's own testimony confirms the relevance. Scott Pelizzaro testified that he purchased Similac Organic A2 because (1) it was the same or substantially similar formula provided to his daughter in the hospital, and (2) Abbott's claims represented the formula as supporting "brain development." *See* Scott Pelizzaro Dep. Tr. 147:3–17. That testimony establishes direct reliance on the very marketing channels and claims encompassed by sub-topics (a), (b), and (d).

Sub-topic (e) – WIC program marketing and contracting – is relevant because at least one Plaintiff in this litigation received Abbott's powdered infant formula through the WIC program. How Abbott marketed to WIC agencies, secured WIC contracts, and positioned its product within the WIC distribution channel goes directly to how that Plaintiff came to use Abbott's formula.

Sub-topic (c) is likewise relevant as Abbott's internal monitoring of public and industry information, and its participation in trade groups such as INCA and IFC, bear on what Abbott knew

about consumer perceptions, regulatory developments, and the industry-wide claims it adopted. All of which is knowledge central to the fraud, misrepresentation, and failure-to-warn allegations.

**TOPIC 12: Facility Conditions, Water Intrusion, Roof and Maintenance.**

FDA's 2022 Establishment Inspection Report documented 530 water events at Abbott's Sturgis powdered infant formula facility from January 2020 through February 2022. Plaintiffs allege that Abbott's distributed powdered infant formula was contaminated with dangerous pathogens, including Cronobacter and Salmonella, as a result of unsanitary conditions at that facility. Thus, the facility's physical condition—including water intrusion, roof deterioration, drainage failures, aging and inadequately maintained equipment, and persistent moisture in a dry-powder manufacturing environment—is not background context. It is central to Plaintiffs' claims.

Topic 12 asks Abbott to produce a witness prepared to testify about facility conditions at the Sturgis plant bearing on contamination risk, including water leaks, standing water, roof deficiencies, condensation, drainage, dry-cleaning limitations, equipment design and cleaning access, construction activity, water intrusion and moisture events, maintenance and repair activities, and Abbott's internal decision-making hierarchy for addressing those conditions. Every element of this topic flows directly from the factual predicate of Plaintiffs' claims, and each element is directly tied to Abbott's obligations under federal law.

Water intrusion and moisture are the critical thread running through every element of this topic. *Cronobacter* and *Salmonella* are environmental pathogens capable of surviving for extended periods in low-moisture environments and thriving wherever moisture is introduced. In a powdered formula facility, moisture is the enemy. A leaking roof introduces moisture. Standing water harbors and spreads pathogens. Condensation on pipes and surfaces creates persistent wet zones. Poor drainage allows pooling. Old or improperly designed equipment creates crevices and dead

zones that cannot be adequately cleaned by dry-cleaning methods — the only cleaning method available in a dry-powder environment. Construction activity generates dust and debris that can carry contamination into production areas. Each of these conditions is inseparable from the others in terms of contamination risk and each condition existed at the Sturgis facility during the relevant time frame. *See* Exhibit D, at p. 90.

Abbott's overbreadth and vagueness objections fail. Rule 30(b)(6) requires only "reasonable particularity," not evidentiary detail. Topic 12 readily satisfies that standard by identifying the specific facility conditions, responsive actions, and corporate decision-making at issue. Nor can Abbott avoid testimony by claiming burden or lack of clarity. Abbott operated the facility, maintained the records, employed the personnel responsible for these conditions, and responded to the same issues in dealing with FDA. A document production is not a substitute for corporate testimony explaining what conditions existed, how Abbott addressed them, who made those decisions, and whether production continued despite known contamination risks. Abbott should therefore be required to designate and prepare a witness to testify fully on Topic 12.

It identifies with precision the physical areas of concern (roof, drains, pipes, equipment), the types of conditions at issue (leaks, condensation, standing water, moisture events), the categories of responsive action (maintenance, repair, replacement, investigation), and the organizational dimension (escalation and decision-making hierarchy). Abbott knows its own facility. Abbott knows what its own employees documented about these conditions in inspection records, work orders, maintenance logs, internal communications, and corrective action reports. The notion that Abbott cannot identify a corporate representative to speak to facility conditions at a plant it operated for decades — a plant the FDA shut down in a nationally publicized enforcement

action — strains credibility, especially when Abbott was able to provide responses to the same questions posed by the FDA. *See* Exhibit D, at pp. 94-95.

**TOPIC 13: Equipment and Maintenance.**

Abbott attempts to improperly limit this topic to the microbiological preventative measures taken ***during the repair*** of the equipment used to manufacture powdered infant formula. Plaintiffs are entitled to know what the conditions are the facility were – regardless of the preventative measures in place while the equipment was actually being repaired. The equipment used in the manufacturing of the powdered infant formula at issue — from raw ingredient processing through blending, drying, filling, and packaging — was not incidental to the contamination risks described herein.  contamination risk. Manufacturing equipment in a dry-powder infant formula facility represents one of the most significant and persistent sources of potential microbiological contamination, and federal law imposes specific, non-delegable obligations on manufacturers to ensure that such equipment is properly designed, maintained, cleaned, and monitored. Abbott's Sturgis facility has a longstanding history of deteriorating equipment, which is directly relevant to Plaintiffs' claims in these cases. Further, Abbott entered into a Consent Decree of Permanent Injunction following the FDA's shut down of the Sturgis Factory. The repairs made after the facility shut down are relevant and a proper matter for Rule 30(b)(6) examination because Abbott's position – that all prior repairs are documented – ***assumes*** that Abbott timely repaired all of its manufacturing equipment that could pose a microbiological hazard prior to the facility shut down. The converse is true. The factory was shut down because Abbott failed to fix the equipment. It was causal, not reactive.

Topic 13 asks Abbott to produce a witness prepared to testify about equipment at the Sturgis facility that was identified or considered as an actual or potential source of microbiological

contamination, including decisions regarding installation, repair, replacement, and maintenance; the personnel responsible for those decisions; related communications and investigations; testing conducted in connection with equipment contamination concerns; and Abbott's relationships with third-party service providers involved in equipment maintenance and repair. Each of these sub-categories is essential to understanding not only how contamination entered Abbott's products, but what Abbott knew about that risk, when it knew it, and what — if anything — it chose to do in response.

**TOPIC 14: AN-Sturgis Roof.**

Plaintiffs have alleged that Abbott's failure to maintain the Sturgis manufacturing facility in a condition adequate to prevent microbiological contamination of powdered infant formula was a direct and proximate cause of the injuries sustained by each of the five minor Plaintiffs. Among the most significant and documentable of those failures was Abbott's handling — or more precisely, its mishandling — of the physical integrity of the Sturgis facility's roof. A compromised roof in a dry-powder infant formula manufacturing environment is not a routine facilities management problem. Moisture events create the environmental conditions in which *Cronobacter*, *Salmonella*, and other pathogens thrive, persist, and ultimately find their way into product.

Topic 14 asks Abbott to produce a witness prepared to testify about the AN-Sturgis roof, including its installation, inspections conducted over time, repairs made or considered, replacement discussions, risk assessments performed in connection with roof condition, related communications and documentation, the personnel responsible for roof-related decisions, and Abbott's relationships with third-party contractors involved in roof repair and maintenance. This topic is precisely the kind of focused, facility-specific inquiry that Rule 30(b)(6) was designed to facilitate. It identifies a discrete physical component of the manufacturing facility, defines the

categories of information sought with respect to that component, and asks Abbott — the only party with direct institutional knowledge of the roof's condition and history — to speak to it.

The relationship between a compromised roof and pathogen contamination in a food manufacturing facility is not a theoretical construct. It is a well-established principle of food safety science and a recognized basis for regulatory enforcement. The FDA's Current Good Manufacturing Practice regulations applicable to infant formula manufacturers, including 21 C.F.R. § 106.20, require that facilities be constructed and maintained in a manner that prevents contamination of the product. Roof integrity is a foundational element of that obligation.

The FDA's inspection of the Sturgis facility and the resulting regulatory action taken in 2022 did not arise in a vacuum. Among the conditions contributing to the FDA's findings were moisture-related issues tied directly to the physical condition of the facility's structure, including its roof. Plaintiffs are not speculating that a roof deficiency might have existed at some point during the facility's operation. The publicly available record of the FDA's regulatory action against the Sturgis facility, including inspection observations and Abbott's own written responses to regulatory inquiries, reflects that conditions at the facility — including structural and moisture-related conditions — were known, documented, and the subject of internal attention over a significant period of time. The question that Topic 14 is designed to answer is not whether Abbott was aware of roof-related issues.

Those are not peripheral questions. They are among the most important questions in this litigation. They bear on whether Abbott's conduct constituted negligence, gross negligence, or something worse. They bear on the adequacy of Abbott's compliance with its obligations under 21 C.F.R. Part 106. And they bear directly on the experience of five minor children who entered the

world dependent on the safety of Abbott's products and who now carry, permanently, the consequences of Abbott's stewardship of the facility in which those products were made.

**TOPIC 15: Consumer Complaints.**

PSC II seeks Abbott testimony regarding the receipt, investigation, root-cause analysis, escalation, and communications regarding consumer complaints related to *Cronobacter* and *Salmonella* from January 1, 2019 to March 31, 2022. Abbott has agreed to provide testimony on *Cronobacter* complaints in full but seeks to cap Plaintiffs to just five *Salmonella* related complaints. Plaintiffs have identified approximately 50 *Salmonella* related complaints from 2019 through January 2022. Each of those involving a baby diagnosed with *Salmonella* and confirmed to have ingested Sturgis-manufactured product. Abbott's proposal attempts to deny questioning on 90% of those complaints.

**TOPIC 17: Policies, Procedures, Processes and Practices.**

Topic 17 seeks testimony concerning Abbott's policies, procedures, processes, and practices governing microbiological contamination prevention, environmental monitoring, contamination-response measures, product release decisions, and related food safety controls applicable to powdered infant formula manufactured at the Sturgis facility during the relevant time period.

Topic 17 is reasonable, proportional, and proper under Rules 26 and 30(b)(6). The challenged subparts concern manufacturing and packaging controls, product sampling procedures, environmental monitoring, contamination investigations, escalation procedures, product holds, release decisions, recalls, food safety systems, and related microbiological control measures directly relevant to Plaintiffs' claims and Abbott's defenses.

Subpart (b) concerns manufacturing and packaging procedures directly related to contamination prevention, sanitary controls, product handling, and microbiological safety during powdered infant formula production. Subparts (e), (f), and (g) concern product sampling procedures, environmental monitoring, microbiological testing, contamination investigations, escalation procedures, product holds, release decisions, and recalls — all central to Abbott's prevention, detection, investigation, and response procedures relating to microbiological contamination at the Sturgis facility. Subpart (i) concerns contamination-prevention systems, including hygienic zoning, hazard analyses, HACCP plans, food safety plans, environmental pathogen evaluations, and water and air quality controls. The remaining challenged subparts similarly concern microbiological contamination controls, food safety systems, corrective measures, and related procedures applicable to powdered infant formula manufactured at AN-Sturgis during the relevant period. Plaintiffs do not seek testimony regarding plant operations generally. Rather, Topic 17 seeks testimony concerning the policies, procedures, and decision-making processes relevant to microbiological contamination prevention, detection, investigation, and product-release decisions. Topic 17 describes discrete subject matters with reasonable particularity and seeks testimony regarding matters known or reasonably available to Abbott concerning the food safety and microbiological control systems applicable to powdered infant formula manufactured at the Sturgis facility.

**TOPIC 19: Lot-Specific Investigation and Traceability.**

Topic 19 is relevant and appropriate under Rule 30(b)(6) because it seeks testimony regarding Abbott's investigative and product-tracing activities relating to products associated with reported infant illnesses outside the recall, including lot tracing, batch record review, distribution tracing, retain sample review, and production history review. These subjects are directly relevant

to Abbott's investigation procedures, knowledge, and evaluation of potential contamination associated with powdered infant formula manufactured at Sturgis. While Topic 3 is specific to the recall, Topic 19, by contrast, seeks testimony regarding the underlying investigative processes and tracing activities Abbott performed to identify, evaluate, and assess potentially implicated product and reported illnesses, regardless of whether they were part of the 2022 recall or before. This topic is particularly relevant to Plaintiffs' cases because four plaintiffs consumed formula that was not included in the recall.

**TOPIC 20: Document Retention and Preservation.**

Plaintiff's proposed area of inquiry: The practices relevant to how the following categories of documents are created and where they are maintained: batch records, complaint detail reports, environmental testing results, in-process testing results, finished product testing results, Maximo work orders, sanitation records, CIP records, CAPA reports, NCRs, pNCRs, documentation of isolate retention and Abbott Nutrition Divisional Destruct Forms (*e.g.*, Lucht Exhibit 62 (ANI-MDL-00256386)).

Plaintiffs have detailed with specificity information known to Abbott addressing the companies document retention and preservation practices. Of all the categories of documents maintained by Abbott, Plaintiffs have targeted twelve (12) categories of documents to be the subject of inquiry on how the documents are created and maintained. Abbott should easily be able explain documents it creates or maintains for each of the categories identified.

**TOPIC 21: Affirmative Defenses.**

Topic 21 seeks proper Rule 30(b)(6) discovery because it requests factual testimony concerning the affirmative defenses Abbott has affirmatively pleaded and intends to rely upon in this litigation. Plaintiffs are entitled to discover the facts, information, and contentions Abbott

contends support those defenses, including the factual bases Abbott intends to advance at summary judgment or trial.

The Topic does not seek privileged attorney-client communications, attorney mental impressions, or litigation strategy. Rather, it seeks factual corporate testimony regarding the bases for Abbott's own pleaded defenses. Courts routinely permit discovery concerning the factual support for asserted claims and defenses because such information is directly relevant to narrowing issues for discovery, dispositive motions, and trial preparation.

The Topic is also described with reasonable particularity. It is limited to the affirmative defenses Abbott itself chose to assert in its pleadings and therefore concerns identifiable subjects already placed at issue by Abbott in this litigation. To the extent Abbott contends particular defenses lack factual support or are purely legal in nature, Abbott may so testify. A blanket refusal to provide any Rule 30(b)(6) testimony regarding the factual support for its affirmative defenses is not justified under Rules 26 or 30(b)(6).

**TOPIC 22: Pelizzaro.**

S.P. Pelizzaro consumed the very first batch of a newly reformulated Similac Organic A2 manufactured at the Sturgis facility and released to market under formulation code 0X859. Plaintiff seeks Abbott's testimony on when and why that reformulation occurred, the ingredient changes it produced, and Abbott's free-product distribution program for Similac Organic A2 — including the program's purpose and the directives given to sales representatives regarding promotion to healthcare providers.

Abbott's own policies classify a reformulation, or "First Lot to Stock," as a "deviation." ANI-MDL-02604594. The reasons for that deviation, the specific ingredient changes, and the risks

attendant to releasing a first-manufactured lot of a reformulated infant formula go directly to the product Plaintiff's child actually consumed.

The free-product distribution program is equally central. As set forth in Topic 10, the Pelizzaros selected Similac Organic A2 after leaving the hospital in part because of Abbott's hospital-channel distribution of that same product, which was made possible by this program. Testimony on the program's purpose and the guidance provided to sales representatives bears directly on marketing, reliance, and causation in the Pelizzaro case. Plaintiff accordingly requests that the Court require Abbott to provide 30(b)(6) testimony on this topic in full.

**TOPIC 23: San Miguel.**

Abbott agreed only to provide testimony regarding "the ingredients for Similac Pro Total Comfort as reflected on the product labels of batches 03677K800 and 04778K800" and incorporated by reference its response to Topic 11. But Topic 11 does not address this topic properly. Topic 23 instead concerns product identification, formulation, composition, packaging, product variants, can sizes, and the reasons why both Similac Total Comfort and Similac Pro-Total Comfort are referenced in Plaintiffs' batch records. Those subjects are directly relevant to identifying the product associated with Plaintiffs' claims and understanding the relationship between the products reflected in the batch records.

Topic 23 also seeks testimony regarding Abbott's "gratis" or free-product distribution program involving these products. Plaintiffs allege the formula consumed was a gratis or no-charge can provided by Plaintiffs' pediatrician. Accordingly, testimony regarding Abbott's gratis distribution program, including how such products were selected, supplied, tracked, distributed, or promoted to healthcare providers, is relevant to product identification and the circumstances under which the product at issue was provided to Plaintiffs. The Topic is described with reasonable

particularity and seeks factual corporate testimony regarding identifiable products, batch records, and distribution practices directly placed at issue in this litigation. It therefore constitutes proper and proportional discovery under Rule 30(b)(6).

**TOPIC 25 (b): Rossick.**

From August 1, 2021 to February 17, 2022, A.G. exclusively consumed Elecare Powdered Infant Formal manufactured at Abbott's AN-Sturgis plant. On October 4, 2021, A.G.'s blood tested positive for Enterobacteriaceae, which was speciated as Salmonella. On October 22, 2022, A.G.'s Cerebro spinal fluid test confirmed that the Salmonella in her blood crossed her blood brain barrier causing Salmonella Meningitis and devastating neurologic deficits. The Parties agree that Abbott will provide a general overview of the contents of a batch records, however, they disagree on the extent of Plaintiffs questions directed to specific batch records.

Rossick Plaintiffs seek to question Abbott regarding Batch Records for four (4) batches of powdered infant formula to be identified by batch number by Rossick Plaintiffs. Pursuant to 21 CFR 106.100, records for powdered infant formula are a detailed documentation that captures the complete history of a specific production lot. These batch records serve as evidence to the key issue in this matter, that is whether the Elecare formula that A.G. consumed was produced in compliance with established safety, quality, and nutrient standards and Good Manufacturing Practices. Although thirteen (13) batches of Elecare were consumed by A.G. prior to the Recall, to achieve compromise, Rossick Plaintiffs agreed to target four (4) batch records. This information is known to Abbott, and only Abbott, and these batch records are not self-explanatory. By providing the exact numbers for each batch record to be discussed, and by limiting the total number of bathes for discussion to four (4) Plaintiffs have efficiently targeted the information sought and in an effort to substitute one deposition for multiple individual depositions.

Abbott would have this Court limit Plaintiffs' questions to only certain sections of the batch records. These guard rails would make understanding each batch records impossible. This limitation allows Abbott to shield parts of each batch record from inquiry and prevents Plaintiffs from asking follow-up questions based on the information they learn during the corporate representative's testimony. Abbott has prepared and preserved these batch records for review by the FDA as part of the Recall, so Abbotts' claims that preparation of a witness to discuss each batch records would be burdensome are inconsistent with the facts of this case. A prepared corporate witness is the most efficient way to address these documents without serial depositions of individual employees. Finally, because of the limitation on the number of Abbott employee/former employee depositions, a corporate representative is the only means of obtaining this testimony.

Finally, PSC II agrees that time limits need to be set for these corporate representative depositions. However, PSC II submits that a ruling on the time limits for these depositions is slightly premature. PSC II requests time limits be set at the in-person hearing on May 18, 2026 after the parties have a better understanding of the scope of the depositions.

## II.     CONCLUSION

For the foregoing reasons, PSC II respectfully requests that this Court compel Defendant Abbott to testify in accordance with Federal Rule of Civil Procedure 30(b)(6) on the matters for examination as proposed by PSC II herein.

Dated: May 14, 2026                              Respectfully submitted,

                                                 **MATTHEWS INJURY LAW**

                                                 */s/ Marc Matthews*
                                                 Marc Matthews *(pro hac vice)*
                                                 1228 E. 7th Avenue, Suite 200
                                                 Tampa, FL 33605

Page **21** of **24**

(813) 530-1000
marc@mcintyrefirm.com

**PREUSS | FOSTER**

/s/ Luke Callahan
Thomas J. Preuss *(pro hac vice)*
Luke F. Callahan *(pro hac vice)*
Andrew Clark *(pro hac vice)*
11141 Overbrook Road, Ste. 104
Leawood, KS 66211
Ph. 816-307-2788
Fax:816-336-9705
tjpreuss@pflaw.com
lcallahan@pflaw.com
aclark@pflaw.com

**DILLEY LAW FIRM, P.C.**

/s/ Claudia I. Guerrero
Claudia I. Guerrero *(pro hac vice)*
315 E. Commerce St., Ste. 203
San Antonio, TX 78205
Ph: 210-225-0111
Fax: 210-228-0493
claudia@dilleylawfirm.com

**TINSMAN & SCIANO, INC.**

/s/ Daniel J. T. Sciano
Daniel J. T. Sciano *(pro hac vice)*
10107 McAllister Freeway
San Antonio, TX 78216
Telephone: (210) 225-3121
Facsimile: (210) 225-6235
dsciano@tsslawyers.com

***Co-Lead Counsel II for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via electronic service on this 14th day of May 2026, pursuant to the Federal Rules of Civil Procedure, to all counsel of record:


/s/ Lisha Bowen
Lisha Bowen